NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**World Color (USA) Corp., a wholly-owned Subsidiary of Quad Graphics, Inc.** *and* **Graphic Communications Conference of the International Brotherhood of Teamsters, Local 715-C.** Cases 32–CA–062242 and 32–CA–063140

February 12, 2014

DECISION AND ORDER

BY CHAIRMAN PEARCE AND MEMBERS HIROZAWA AND JOHNSON

On July 31, 2013, Administrative Law Judge William Nelson Cates issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel filed an answering brief, and the Respondent filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions only to the extent consistent with this Decision and Order.[2] Specifically, we agree with the judge that the Respondent's hat policy violated Section 8(a)(1).[3] However, for the reasons discussed below, we reverse the judge's finding that the Respondent also violated Section 8(a)(1) by its statement to an employee about the employee's Facebook posts.

From late September 2010 through February or March 2011, lead press operator John Vollene, who was a member of the Union's negotiating committee, posted comments on his Facebook page criticizing the Respondent and discussing the Union in response to another individual's initial post. Vollene was Facebook friends with several coworkers, including his shift supervisor, Arvil Bingham, with whom he also socialized outside of work. On October 4, 2010, a decertification petition was filed, and, on November 30, 2010, employees voted to decertify the Union. The Certification of Election Results was issued on February 1, 2011.

Business began to decline in late 2010, and in January 2011, Pressroom Manager Ernest Koch met with the pressroom shift supervisors, including Bingham, to discuss the downturn in business. After identifying each shift's best press operators, they decided who the best press operators would be for each press on each shift. The reassignments, which affected all shifts, would not involve any reduction in employees' pay, hours of work, or job duties. Neither the Union nor Facebook was mentioned at this meeting. On February 18, 2011, Bingham advised his shift's lead press operators of the reassignments. Vollene was one of many reassigned press operators. When Vollene later asked Bingham why the reassignments were happening, Bingham stated that it was not always about production and asked Vollene if he did not think that management knew about his Facebook posts.

The judge found that Bingham's statement to Vollene violated Section 8(a)(1). The judge stated that the test in determining whether an employer's statement constitutes an implicit or explicit threat of retaliation for engaging in protected activity is whether the remarks may reasonably be said to have a tendency to interfere with the free exercise of employee rights under the Act.[4] Stating that Vollene could reasonably believe that his reassignment was retaliation for his Facebook posts, which the judge deemed protected activity, the judge concluded that Bingham's comments interfered with, restrained, and coerced Vollene in the exercise of his Section 7 rights.

---

[1] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the records and find no basis for reversing the findings.

[2] We have amended the remedy and modified the judge's recommended Order and notice to conform to our findings and the Board's standard remedial language.

[3] For the reasons stated by the judge, we affirm his finding that the Respondent's policy that prohibits employees from wearing any baseball caps other than company caps is overbroad and in violation of Sec. 8(a)(1). It is undisputed that the policy on its face prohibits employees from engaging in the protected activity of wearing caps bearing union insignia. We affirm the judge's finding that this prohibition was not part of the Respondent's company uniform policy and that the asserted special circumstances for the prohibition lack merit. Moreover, we note that the result would be the same even if we accepted the Respondent's argument that the cap policy is part of the company uniform policy. "An employer cannot avoid the 'special circumstances' test simply by requiring its employees to wear uniforms or other designated clothing, thereby precluding the wearing of clothing bearing union insignia." *Stabilus, Inc.*, 355 NLRB No. 161, slip op. at 3 (2010) (referencing *Great Plains Coca-Cola Bottling Co.*, 311 NLRB 509, 515 (1993), and *Meijer, Inc.*, 318 NLRB 50, 56–57 (1995), enfd. 130 F.3d 1209 (6th Cir. 1997)).

In his recommended Order and notice, the judge characterizes the Respondent's policy pertaining to baseball caps as discriminatory and provides for the Respondent to cease and desist from enforcing it. We need not pass on whether the policy is discriminatory or was unlawfully enforced—neither of which was alleged in the complaint. Rather, as explained above, we find that the policy violates Sec. 8(a)(1) because it is overbroad.

[4] In his decision, the judge inadvertently characterized this standard as applicable when assessing whether a statement constitutes retaliation, rather than whether a statement constitutes an implicit or explicit threat of retaliation.

Contrary to the judge, we find that the record fails to establish that Vollene's Facebook posts constituted protected activity, and we therefore find that the Respondent's statement did not violate Section 8(a)(1).

The Board has found Facebook posts among employees about terms and conditions of employment to be protected concerted activity. See, e.g., *Bettie Page Clothing*, 359 NLRB No. 96, slip op. at 1 (2013); *Hispanics United of Buffalo*, 359 NLRB No. 37, slip op. at 1 (2012). However, the record here does not include a printout of Vollene's posts, and it provides scant evidence regarding their nature. It reveals neither that the posts concerned terms and conditions of employment, nor that the posts were intended for, or in response to, Vollene's coworkers. The testimony indicates only that Vollene posted unspecified criticisms of the Respondent and unspecified comments about the Union over a period of 5 or 6 months, and that he responded to another person's initial post. The record does not identify that individual either by name or as a coworker. Based on this limited evidence, we will not infer that Vollene's posts amounted to protected concerted activity. That Bingham's statement implied that the Respondent had reacted adversely to critical posts is insufficient to bridge the evidentiary gap here. To be sure, an employer may violate Section 8(a)(1) even where an employee has not engaged in protected concerted activity—if, for example, the employer maintains a rule that reasonably would be interpreted by employees as prohibiting Section 7 activity[5] or the employer believes (mistakenly) that the employee has engaged in Section 7 activity.[6] But in the particular circumstances of this case, the General Counsel has failed to demonstrate that Bingham's statement was directed at, or in response to, either actual or suspected protected concerted activity by Vollene or that Vollene would reasonably understand Bingham's statement as interfering with, restraining, or coercing him from engaging in such activity. Accordingly, we reverse the judge and dismiss this complaint allegation.

AMENDED CONCLUSIONS OF LAW

Substitute the following for Conclusion of Law 3 in the judge's decision.

"3. By maintaining in effect at its Fernley facility a rule and safety policy statement, 'Baseball caps are prohibited except for Quad/Graphics baseball caps worn with the bill facing forward,' the Respondent has been interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act and has violated Section 8(a)(1) of the Act."

AMENDED REMEDY

Regarding the unlawful baseball cap policy, we shall modify the judge's recommended Order in accordance with *Guardsmark, LLC*, 344 NLRB 809, 812 (2005), enfd. in relevant part 475 F.3d 369 (D.C. Cir. 2007). Pursuant to *Guardsmark*, the Respondent may comply with the Order by rescinding the unlawful provision and republishing its "Employee Guidelines for U.S. Employees" for employees at the Fernley facility without the unlawful provision. We recognize, however, that republishing the Guidelines for that facility could be costly. Accordingly, the Respondent may supply the employees at its Fernley facility either with an insert to the Guidelines stating that the unlawful policy has been rescinded, or with a new and lawfully worded policy on adhesive backing that will cover the unlawfully broad policy, until it republishes the Guidelines either without the unlawful provision or with a lawfully-worded policy in its stead. Any copies of the Guidelines that are printed with the unlawful policy must include the insert before being distributed to employees at its Fernley facility. See *2 Sisters Food Group*, 357 NLRB No. 168, slip op. at 8 fn. 32 (2011); *Guardsmark*, supra at 812 fn. 8.

ORDER

The National Labor Relations Board orders that the Respondent, World Color (USA) Corp., a wholly-owned subsidiary of Quad Graphics, Inc., Fernley, Nevada, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining an overbroad policy in its "Employees Guidelines for U.S. Employees" that prohibits employees from wearing baseball caps bearing union insignia.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the overbroad policy in its "Employee Guidelines for U.S. Employees" that prohibits employees at the Fernley facility from wearing baseball caps bearing union insignia.

(b) Furnish all current employees at its Fernley facility with inserts for its "Employee Guidelines for U.S. Employees" that (1) advise that the unlawful policy has been rescinded, or (2) provide the language of a lawful policy; or publish and distribute to employees at its Fernley facility revised copies of its "Employee Guidelines for U.S. Employees" that (1) do not contain the unlawful policy, or (2) provide the language of a lawful policy.

---

[5] E.g., *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 646–647 (2004).

[6] See, e.g., *Monarch Water Systems, Inc.*, 271 NLRB 558 fn. 3 (1984).

WORLD COLOR (USA) CORP.

(c) Within 14 days after service by the Region, post at its Fernley, Nevada facility copies of the attached notice marked "Appendix."[7] Copies of the notice, on forms provided by the Regional Director for Region 32, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since February 18, 2012.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 32 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. February 12, 2014

_____
Mark Gaston Pearce,                    Chairman

_____
Kent Y. Hirozawa,                      Member

_____
Harry I. Johnson, III,                 Member

(SEAL)   NATIONAL LABOR RELATIONS BOARD

APPENDIX
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain an overbroad policy in our "Employee Guidelines for U.S. Employees" prohibiting you from wearing baseball caps bearing union insignia.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL rescind the overbroad policy in our "Employee Guidelines for U.S. Employees" prohibiting you from wearing baseball caps bearing union insignia.

WE WILL furnish you with inserts for our "Employee Guidelines for U.S. Employees" that (1) advise that the unlawful policy has been rescinded, or (2) provide the language of a lawful policy; or publish and distribute to you revised copies of our "Employee Guidelines for U.S. Employees" that (1) do not contain the unlawful policy, or (2) provide the language of a lawful policy.

WORLD COLOR (USA) CORP., A WHOLLY-OWNED SUBSIDIARY OF QUAD GRAPHICS, INC.

---

[7] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

*Yaromil Velez-Ralph, Esq.*, for the Government.[1]
*Ronald J. Holland, Esq.*, and *Jason W. Kearnaghan, Esq.*, for the Company.[2]
*Jennifer Lumsden, Union President*, for the Union.[3]

## DECISION

### STATEMENT OF THE CASE

WILLIAM NELSON CATES, Administrative Law Judge. This case involves the Company's hat (baseball cap) policy as well as an alleged statement by a Company representative to an employee, both of which, the government contends, interferes with, restrains, and coerces employees in the exercise of rights guaranteed in Section 7 of the National Labor Relations Act (Act) and in violation of Section 8(a)(1) of the Act. I heard this case in trial in Reno, Nevada, on June 4, 2013. The case originates from charges filed on and after August 8, 2011, by Graphic Communications Conference of the International Brotherhood of Teamsters, Local 715-C (Union). The prosecution of the case was formalized on September 26, 2012, when the Regional Director for Region 32 of the National Labor Relations Board (Board), acting in the name of the Board's Acting General Counsel, issued a order consolidating cases, consolidated complaint, and notice of hearing (complaint) against World Color (USA) Corp., a wholly owned subsidiary of Quad Graphics, Inc. (Company). The Company in its answer to the complaint, and at trial, contends the alleged unlawful statement attributed to one of its supervisors turns on credibility; and, its hat policy does not interfere with employees Section 7 rights.

The parties were given full opportunity to participate, to introduce relevant evidence, to examine and cross examine witnesses, and to file briefs. I carefully observed the demeanor of the witnesses as they testified and I rely on those observations here. I have studied the whole record, and based on the detailed findings and analysis below, I conclude and find the Company violated the Act essentially as alleged in the complaint.

### FINDINGS OF FACT

#### I. JURISDICTION, SUPERVISORY/AGENCY STATUS AND LABOR ORGANIZATION

The Company is a Wisconsin corporation with an office and place of Business in Fernley, Nevada, where it has been, and continues to be, engaged in the business of printing and publishing for commercial customers. During the calendar year ending December 2011, a representative period, the Company purchased and received at its Fernley, Nevada facility goods valued in excess of $50,000 directly from points outside the State of Nevada. The parties stipulated, and I find, the Company is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

The parties stipulated, and I find, that at times applicable here, Randy Bingham was a supervisor and agent of the Company within the meaning of Section 2(11) and (13) of the Act.

The parties stipulated, and I find, the Union is a labor organization within the meaning of Section 2(5) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. Background and Related Facts

The Company prints commercial inserts, including Parade Magazine, for many newspapers mid-week and weekend editions. Customers utilizing inserts to advertise sales for their businesses include; J. C. Penny's, Kohl's, Walgreens, Office Depot, Sears, and Wal-Mart. The fall season is the busiest time of the year for the Company with clients advertising their holiday sales. For example, one of Wal-Mart's biggest insert sales advertisements is for "Black Friday," the sales day following Thanksgiving Day. In fact Wal-Mart provides security at the Company to protect its "Black Friday" advertisements from being known by its competition before the release date.

In addition to Company offices at Fernley there are several departments in the facility. The departments are pre-press, pressroom, maintenance, quality control, raw storage, shipping, and receiving. The employees work 12 hour shifts rotating between day and night shifts. The pressroom department has 5 presses identified as 1or G201, 3 or G203, 4 or G204, 5A or G205, and 5B or G206. The presses differ by age and capacity with press 1 being the newest and fastest and press 4 the slowest. For an extended time the Company operated all 5 presses each shift; however, the Company began to experience a downturn in business in late 2010 that brought about a reduction in force the first quarter of 2011.

Pressroom Manager Ernest Koch met in late 2010 with his 4 pressroom shift supervisors, including Shift Supervisor Bingham, along with 2 technical supervisors and 1 trainer supervisor to discuss the downturn in business. Koch told his supervisors the Company was going to lose capacity and asked them to identify their best press operators looking at their strengths and weaknesses. Koch and the supervisors reached an agreement regarding which were the best operators on each of the shifts and for which press. Pressroom Manager Koch testified there was no mention of Facebook postings, social media, or union activities at his meeting with the pressroom shift supervisors and added the decision to shift lead press operator John Vollene, or the others, from one press to another, had nothing to do with Facebook postings, social media, or union activities. Koch testified the changes did not take place, nor were the employees notified, in late 2010, because that was the busiest time of the year for the Company due to holiday advertisements. In late 2010 Pressroom Manager Koch said he expected the first reduction in force to take place in the first quarter of 2011 and in fact it occurred around March 2011.

Pressroom Manager Koch testified he spoke in January 2011 with a number of lead press operators who were being moved from one press to another. Koch said he personally spoke, in his office, with Vollene about his reassignment. Koch testified Vollene was not pleased about the reassignment and wanted to know why. Koch explained to Vollene he and the shift supervisors had met and decided, based on the strengths and weak-

---

[1] I shall refer to counsel for General Counsel as counsel for the Government and the Acting General Counsel as the Government.

[2] I shall refer to counsel for the Respondent as counsel for the Company and shall refer to the Respondent as the Company.

[3] I shall refer to the Charging Party as the Union and to its president as union president.

5
WORLD COLOR (USA) CORP.

ness of the operators, who would be assigned to which press to maximize production. Koch said Vollene made no mention of any suspicion that his Facebook postings, social media, or union activities were reasons for his reassignment. Koch testified he also spoke with other lead press operators around the same time about their reassignments, namely, Billy Cleland, Curtis Farrel, and Wayne Parris. Koch said he spoke with those whom he thought might not be pleased being reassigned. Those reassigned did not incur any reduction in pay, hours of work, or job duties. The job reassignments are not in issue here. Thereafter, there was a shifting of operators from press to press involving all shifts and various operators. Operator Vollene, for example, was considered by management to be an average operator, on his shift, at a time when they needed someone to maximize productivity on its fastest press (G201) which Vollene operated. Four, of the five lead operators on Vollene's shift, were moved to different presses.

Vollene and Cleland both denied Koch spoke with them in January 2011 about their reassignments from one press to another.

Vollene worked for the Company in the pressroom for approximately 11 years before he was laid off on March 25, 2011, as a result of a Companywide reduction in force. At applicable times here he was a lead pressman reporting to Shift Supervisor Bingham. Vollene was a member of the Union's contract negotiating committee beginning in 2007 and continuing until the Union was decertified at the Company in late 2010 or early 2011. Vollene has had an account on Facebook, a social media group, for a number of years where he posts comments, pictures, and jokes. Starting in September 2010, and continuing for 5 or 6 months, he commented about the Company and Union on Facebook where his "Facebook friends," some of whom were also employees of the Company, could read and comment thereon. Vollene, and his supervisor, Bingham, were and are, Facebook friends and read each other's postings. Bingham and Vollene have been personal friends, who socialize away from work, for over a decade, and have continued their friendship to the present even though Vollene has been laid off work and Bingham has left Fernley, Nevada.

### B. *The Statements of Shift Supervisor Bingham*

It is alleged at paragraph 6 of the complaint that the Company, by Shift Supervisor Bingham, at its Fernley, Nevada facility, told an employee he was being moved to a new machine because of the employees' protected social media activities including comments supportive of the Union in violation of the Act.

Vollene testified that at work on February 18, 2011, Shift Supervisor Bingham called a meeting in his office of all lead pressmen on his shift. Those present in addition to Vollene were lead pressmen Rich Garza, Steve Schaffer, Billy Cleland, and Jeff Livingston. Bingham covered what was being done at the time in the pressroom and said something was coming up that he would tell them about later. Vollene said they "pushed" Bingham to tell them then what was coming down, and, with some "coaxing" Bingham said each of them, except Livingston, would be reassigned to different presses. Vollene said they were all upset about being reassigned. Vollene explained he was upset, with his feeling hurt, because "press 1 had been [his] home for the last five years. I had my crew . . . you get set in your ways" and added each piece of machinery had its own "quirks and bugs" and reacted differently. Vollene testified the lead pressman then notified their crew members of the upcoming changes.

Vollene testified that over the next couple of days he repeatedly asked Bingham why the changes. Vollene told Bingham he did not understand the situation that he had much more experience on press 1 than the others and added the majority of the time he never came in last in production. Vollene told Bingham he had always produced a good product and reminded Bingham he only had one complaint about his work in 5 years. Vollene advised Bingham he thought the changes were "from the standpoint of production and flow . . . throwing a big wrench in the . . . pressroom." Vollene testified, he, while on nightshift, again raised his concerns with Bingham alone in Bingham's office. Vollene made his case to Bingham he was a good press operator and did not understand the reassignment situation. Vollene testified:

> . . . he told me it wasn't always about production that—he said that the management knew about my posts on Facebook. He—he asked me a question. He said don't you think that they know about what you posted on Facebook.

Vollene said he was upset with himself and told Bingham, "I should've known better in listening to rumors. I didn't know that—I didn't realize that Quad was that type of employer; that I wasn't allowed to have an outside life, and basically my freedom to say what I wanted when I was off the clock." Vollene said he did not discuss it with Bingham again, because it was "pretty much a dead subject," and, he knew the reassignments were coming.

Shift Supervisor Bingham did not recall any mention of Facebook at the meeting of shift supervisors he attended with Pressroom Manager Koch in late 2010. Bingham said Vollene, as well as the other lead pressmen, were reassigned from press to press as a result of a joint decision by the shift supervisors and had nothing to do with Facebook, social media, or the Union. Bingham did not recall telling Vollene he was being moved because of his Facebook or social media activities. Shift Supervisor Bingham did not recall telling Vollene management knew about Vollene's Facebook activities or of having a conversation with Vollene at which he told him management knew about his social media posts. Bingham also did not recall telling Vollene management was aware of his union activities. Bingham; however, acknowledged he was friends on Facebook with Vollene and could see whatever Vollene posted on Facebook. Bingham acknowledged reading Vollene's Facebook postings about the Company including comments critical of the Company. Bingham's pretrial affidavit, given to the Board, also reflects, "It is—possible that I may have talked to employees about disparaging or other remarks about the employer on Facebook, but I do not recall any such conversation."

Certain credibility resolutions are helpful in deciding the issue here; however, a resolution regarding what, if anything, was said between Vollene and pressroom shift supervisor Bingham on, or about, February 19 or 20, 2011, is essential.

I found Vollene and Cleland to be credible witnesses, who as they testified, persuaded me, by their demeanor, they were attempting to do so truthfully

First, I am persuaded there is no evidence that the subject of Facebook, social media, or the Union was discussed at the meeting between Koch and his pressroom shift supervisors when he discussed with them the downturn of business that led to the realignment of the lead press operator's assignments. Second, I credit Vollene's and Cleland's testimony that Pressroom Manager Koch did not tell them in January 2011 they were going to be reassigned from one press to another, and; that the reassignments would be effective in the first quarter of 2011. Certain observations strengthen my conclusion Vollene and Cleland testified truthful regarding Koch not speaking with them in January 2011. For example, the lead pressman, at their meeting with pressroom shift supervisor Bingham on February 18, 2011, had to "coax" and "push" Bingham to tell them what was going to happen to them later on. If Pressroom Manager Koch had already told, at least some of the lead pressmen in January 2011, they were going to be reassigned to different presses, I am persuaded Bingham would not have been so reluctant to talk about or tell them something most of them already knew. Additionally, it appears Koch wanted his shift supervisors input about their lead pressmen's reassignments and it follows Koch would have wanted that information regarding the changes to be announced to the lead press operators by their shift supervisors.

I am also persuaded Vollene testified truthfully regarding pressroom shift supervisor Bingham's conversation with him one or 2 days after their February 18, 2011 meeting in Bingham's office. Bingham had a lapse of memory with respect to his conversation with Vollene. Bingham stated he did not recall telling Vollene he was being moved from one press to another because of his Facebook or social media activities. Bingham impressed me as being unable or unwilling to recall certain aspects of his conversation with Vollene. I am persuaded Bingham was unwilling to fully recall the discussions of that evening. In his pretrial affidavit, given to the government, Bingham, at the time of the affidavit, even acknowledged he may have talked to other employees about disparaging remarks regarding the Company on Facebook, and; Bingham certainly knew about Vollene's critical Facebook postings related to the Company. These additional factors support Vollene's testimony he was told his postings on Facebook impacted his reassignment to a different press in the pressroom. The fact that Facebook or social media was not raised or discussed at Pressroom Manager Koch's meeting with his shift supervisors does not require a different result than I find here, that Vollene testified truthfully.

I note the test in determining whether an employer's statements constitutes retaliation or other negative consequences for employees' engaging in protected activity is whether the remark(s) may reasonably be said to have a tendency to interfere with the free exercise of employees rights under the Act and does not turn on the motivation for the remark(s). When applying this standard, the Board considers the totality of the relevant circumstances. *Sawgrass Auto Mall* 353 NLRB 436, 437, 444 (2008).

When Pressroom Shift Supervisor Bingham told Vollene, as I find he did, that his reassignment from press 1 to press 4 wasn't always about production, that the Company knew about his Facebook postings; Vollene could reasonably believe his reassignment was in retaliation for his protected activity and that other negative consequences could follow. Bingham had already told Vollene the reassignments were determined and decided upon by higher management and alerted Vollene with a rhetorical question that higher management knew of his Facebook postings which were unfavorable of the Company. If Bingham thought Vollene, incorrectly interpreted what he told him, Bingham could have set the matter straight when Vollene told Bingham he did not think the Company was that kind of an employer that would not allow him the freedom of expressing himself on Facebook when he was "off the clock." There is no evidence Bingham responded in any manner to Vollene's parting remarks that evening. I find Bingham's comments interfered with, restrained, and coerced Vollene in the exercise of rights guaranteed him in Section 7 of the Act and in violation of Section 8(a)(1) of the Act as alleged in the complaint.

### C. The Hat (Baseball Cap) Policy

It is alleged at paragraph 7 of the complaint, as amended, that since about April 26, 2011, the Company maintained in effect at its Fernley, Nevada facility, a set of "Employee Guidelines for U.S. Employees," which included the following rule and/or safety policy, the violation of which subjects employees to corrective action up to and including immediate discharge.

> ". . . Baseball caps are prohibited except for Quad/Graphics baseball caps worn with the bill facing forward . . . [Corporate Safety Program," Policy No. 24]

The parties do not dispute the Company maintains in effect a set of "Employee Guidelines for U.S. Employees" (Guidelines) a copy of which is given to all employees. The partial rule set forth in the complaint is taken from Guidelines section 3; "Protecting Our Employees and Our Facilities" bulletin 24 which in its entirety reads:

> All hair hanging past the bottom of the collar must be secured to the head while in the production areas. If hair does not hang past the collar but could potentially get caught in our equipment, it must be secured to the head with a hairnet or by other means. Baseball caps are prohibited except for Quad/Graphics baseball caps worn with the bill facing forward. Ponytails are strictly prohibited. Facial hair longer than the base of the neck must be secured.

During the time the Company was operated as World Color, from at least 2000 until approximately 2007, it had a dress code policy that required employees to wear uniform type "Dickie" brand shirts and pants provided by the Company. There was no hat policy at that time. Around the beginning of 2007, after the Union became the certified bargaining representative for hourly employees' at the Company, the dress policy changed, uni-

forms became optional, employees could wear the previous shirt and pant combination or just jeans and T-shirt. There was no hat policy during that time. However, the employees could choose, or decline, to wear baseball type caps; but, offensive language, such as profanity, was prohibited on the hats. After the Union was decertified in late 2010 or early 2011, a dress code was established. Quad Graphics took over the Company, in mid-2010, and established a dress code requiring employees to wear Company provided uniforms. The new navy blue polyester uniforms consist of a shirt with the employees' name and Company logo and pants. A new hat policy, separate from the dress code, was announced, whereby employees could, if they chose, wear a hat at work, but, it had to be a baseball type hat with the Company's logo, and the bill worn forward, and had to be purchased by the employees from eight styles established by the Company and available through the Company's intranet system at the employees' expense.

Vollene testified he wore a baseball type hat at work before Quad/Graphics took over the Company. Vollene explained he wore his baseball cap to keep paper dust and grease out of his hair and he wore the bill facing backwards for safety reasons in that it permitted him a "broader view" of his field of work. Vollene said the only restriction on baseball type hats, prior to Quad/Graphics, was no profanity on the hats. Vollene testified the employees learned of the new uniform policy, as well as other changes, by Quad/Graphics in early 2011. He explained the plant and other managers explained the new or changed rules at small group meetings. Vollene testified; "it was brought up in a couple meetings as managers learned. I mean they were just as blind going into the merger as everybody else was, I mean they didn't know anything really about Quad/Graphics. So as they learned they kind-of . . . [learned by] the trickle down effect." Vollene testified he and other employees were provided a copy of "Employees Guidelines for U.S. Employees" which he described; "I guess you would call it their code of conduct, and rules and regulations for the plant." Vollene testified the new hat policy in the Guidelines was explained to he and others at small group meetings with the plant manager. They were told they could only wear a hat from those approved by the Company with the Company logo and the hat bill had to face forward. Vollene said employees could only order the hats from the Company. Vollene said the new hat policy was not implemented before he was laid off.

Vollene testified some customers had visited the facility, explaining, Sears did so once a year. Vollene stated that when customers did visit they mostly stayed in the quality control office and explained he never had any interaction with customers. Vollene stated that the only way he even knew Sears visited the facility was the Company hung a banner in front of the facility that welcomed "Sears our biggest customer, or something to that effect." Vollene could not remember any customer visiting the facility from the time Quad/Graphics took over the Fernley facility until his employment ended with the Company. Lead press operator, Cleland testified he had never seen a customer at the facility. Vollene and Cleland both stated Wal-Mart provided extra security guards at the facility before Black Friday while Wal-Mart's inserts were being printed.

Vollene testified he only knew of one incident that might be considered criminal activity at the facility. The incident involved someone dropping, what he guessed was a bag of drugs, on the premises. The local sheriff was called and that was pretty much all that happened. Vollene placed the incident as years ago well before Quad/Graphic acquired the facility. Vollene was not aware of any gang activity at the facility. Vollene and Lead Press Operator Cleland knew of no fights or disagreements at the facility that required police intervention. Cleland recalled two incidents of criminal behavior at the facility, one in 2001 when some cars in the parking lot were broken into and another when some copper was stolen in 2010.

Employee Phillip Decker testified he was not aware of any gang or criminal activity that required police action at the facility during his employment that started in 2000. Additionally, Decker never witnessed any customer visits to the facility.

Company vice president of human resources Nancy Ott testified she is responsible for vision, oversight, and strategy for company policies for all eight human resources operational areas of the Company including the facility in Fernley. Ott said all Company policies are set forth in the "Employee Guideline for U.S. Employees" and was most recent updated January 2011. Ott testified she was involved in drafting the Company's hat policy. Two departments or teams, in addition to the human resources department, were involved in the drafting, namely, the security team and the safety team. The Company started contemplating a hat policy in mid-2010. Ott explained the safety concerns centered around the hat being capable of securing the employees hair to their head to avoid being caught in the higher speed presses in the press room. Ott stated the security concerns centered around "gang insignia and symbolism" and that the bill face forward so as not to signify any gang type activity. She said security was also concerned that the color of the hats not signify gang activity. Ott testified, the Company also "wanted to make sure the hat aligned with the uniform policy from a presentation standpoint." Ott stated wearing a hat is not a requirement of the uniform policy, nor a required piece of safety equipment, but rather an optional piece of clothing within the uniform policy. Ott said the hat policy was not rolled out until after the results of the decertification election became final. She placed the roll out as taking place in February 2011.

Ott acknowledged, on cross-examination, that the Company hats had no specific safety features built in, nor was she aware of any special requirements placed on the vendor that provided the hats except as to color and the Company logo.

Ott was not aware of any gang activity at the Fernley facility nor was she aware of gang insignia and/or symbolism concerns applicable to the Fernley facility. Ott was not aware of any particular facility where the Company had a gang insignia and/or symbolism problem. Ott also stated she was not aware of any disagreements or fights between employees at Fernley that required police intervention.

Section 7 of the Act grants employees the right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. In *Republic Aviation Corp. v. NLRB* 324 U.S. 793 (1945), the Supreme Court upheld the right of employees to wear union insignia at work. Stated differently the Board, with court approval, has long held that in the absence of special circumstances employees have a Section 7 right under the Act to wear insignia referring to unions or other matters pertaining to working conditions for the purpose of mutual aid or protection. See e.g. *Goodyear Tire & Rubber Co.*, 357 NLRB No. 38 slip op. at 5 (2011). An employer may prohibit the wearing of union insignia by its employees if, and only if, the employer can demonstrate substantial evidence of special circumstances that would outweigh the employees' rights protected by Section 7 of the Act. As noted in *Goodyear Tire & Rubber Co.*, supra at slip op. 5:

> Special circumstances can include violence, interference with training or production, or threats thereof, the instigation of disciplinary misconduct, disparaging the employer's products and/or services, interference with safety or unreasonable interferences with the image the employer desires for its employees to project to its customers or suppliers. See e.g. *Escanaba Paper Co.*, 314 NLRB 732 at 732–735 (1994). The employer bears the burden of proving special circumstances. *W. San Dirgo*, 348 NLRB 372, 373 (2006). The special circumstances exception is; however, narrow and "a rule that curtails an employee's right to wear union insignia at work is presumptively invalid." *E & L Transport Co*, 331 NLRB 630 fn. 3 (2000). General, speculative, isolated or evidence of potential disruption to an employer's operations does not amount to special circumstances. *Boise Cascade Corp.*, 300 NLRB at 82.

Customer exposure to union insignia, standing alone, is not a special circumstances which permits an employer to prohibit display of such insignia by employees. *United Parcel Service*, 312 NLRB 596, 597 (1993), citing *Nordstrom, Inc.*, 264 NLRB 698, 701–702 (1982). However, as Judge Clifford H. Anderson outlined in *Nordstrom*, supra, the court in *NLRB v Harrah's Club*, 337 F.2d 177 (9th Cir. 1964), created an additional "special consideration" when it held that an employer may prohibit the wearing of union insignia in order to maintain a certain type of employee image in the public eye. Judge Anderson also noted the Board has accepted this factor as a "special consideration."

The entire circumstances of a particular situation must be examined to balance the potentially conflicting interests of employees' right to display union insignia, in this case on hats worn at the Company, and, the Company's right to limit or prohibit such wearing of union insignia.

To the extent it is necessary I find the uniform and hat policies are two separate distinct policies. I am fully persuaded the hat policy is not part of the uniform policy. The hat policy is set forth in the "Employee Guidelines For U.S. Employees" under "Protecting Our Employees and Our Facilities" safety policy number 24, whereas, the dress code is set forth under "Quad/Graphics' Expectations" as "uniforms." The hat policy was formulated by the safety, security and human resources departments with emphasis on safety such as securing an employees hair safely to the employees head, as well as, security concerns regarding gang insignia and symbolism specifically with the color of the hats and the direction of the bills. All of this persuades me the hat policy was not a part of the dress code or simply an attempt to make the hats aligned with the uniform policy from a presentation viewpoint. If the hat policy was just to make the optional hat color coordinated with the uniforms then the hat policy would have been made a part of the dress code and placed with the dress code in the "Employee Guidelines For U.S. Employees."

The facts, for this portion of the case, essentially are not in dispute. The Company's hat policy forbids ". . . baseball caps . . . except for Quad/Graphics baseball caps worn with the bill facing forward." Only the Company logo may be worn on the hats which must be ordered from the Company. I find the Company's hat policy forbids or prohibits employees from displaying union logos, or for that matter other protected messages, on their hats, if they chose to wear hats, thereby restricting employees from engaging in activity protected by the Act.

Did the Company present evidence of special circumstances that would allow it to limit or prohibit its employees from displaying union insignia on the hats? I am fully persuaded it did not.

The Company asserts it established its hat policy, based in part, as stated by Company vice president of human resources Ott, on safety concerns. However, she acknowledged no specific safety features were built into the Company logo baseball hats nor was she aware of any special requirements placed on the vendor that provided the baseball hats except as to the color and placement of the Company's logo on the hats.

The Company failed to present evidence that permitting its employees to wear union logo baseball type hats would likely jeopardize its employees safety. There is no evidence that a baseball hat, with a union logo, would not secure employees' hair to their heads preventing the hair from being caught in the high speed presses in the pressroom.

The Company established its hat policy, in part, according to Ott, on security concerns related to gang activity. However, vice president of human resources Ott acknowledged she was not aware of any gang activity or gang symbolism concerns at the Fernley facility nor was she aware of where the Company had a gang insignia and/or symbolism problem. Pressman Decker credibly testified he was not aware of any gang activity at the Fernley facility during his employment starting in 2000. Lead Pressman Cleland was also unaware of any gang activity at the Fernley facility since he started working for the Company in 2001.

Vice president of human resource Ott stated the Company implemented the hat policy, in part, because it wanted its hat policy to be aligned with its uniform policy from a "presentation standpoint." The record does not establish any employee interaction with customers. Lead pressman Vollene identified a number of customers of the Company but said he had no interaction with any customers. Vollene explained customers mostly stayed in the quality control office. Vollene explained a customer, Sears, visited the facility and the only way he knew Sears was there, the Company "hung a big banner up in front of

the building that said, Welcome Sears our biggest customer, or something to that effect." Lead Press Operator Cleland and Pressman Decker credibly testified they never saw any customers at the facility. While Wal-mart had security guards at the facility around its "Black Friday" sales day such were not customers of the Company. The record is void of any real interactions between employees and customers. The Company failed to show that baseball caps, with union insignia, worn by employees, would detract from its employee presentation desires or objectives.

The Company failed to establish any "special circumstances" that would justify its hat policy. By implementing a hat policy that prohibits employees form displaying a union logo or insignia the Company violated Section 8(a)(1) of the Act.

CONCLUSIONS OF LAW

1. The Company, World Color (USA) Corp., a wholly-owned subsidiary of Quad Graphics, Inc., is an employer engaged in commerce with the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union, Graphic Communications Conference of the International Brotherhood of Teamsters, Local 715-C, is a labor organization within the meaning of Section 2(5) of the Act.

3. By maintaining in effect at its facility a rule and safety policy statement, ". . . baseball caps are prohibited except for Quad/Graphics baseball caps worn with the bill facing forward . . ." and, by telling an employee the employee was being reassigned from one press machine to another because of the employee's protected concerted social media activities that included comments supportive of the Union; the Company has been interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act and has violated Section 8(a)(1) of the Act.

REMEDY

Having found the Company has engaged in certain unfair labor practices, I find it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. The Company is to forthwith rescind that portion of its "Employee Guidelines for U. S. Employees" which at "Corporate Safety Program" policy no. 24 reads ". . .baseball caps are prohibited except for Quad/Graphics baseball caps worn with the bill facing forward. . ." and so notify its employees. I recommend the Company be ordered, within 14 days after service by the Region, to post an appropriate "Notice to Employees" in order that employees may be apprised of their rights under the Act, and the Company's obligation to remedy its unfair labor practices.

On these findings and conclusions of law and on the entire record, I issue the following recommended[4]

---

[4] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

ORDER

The Company, World Color (USA) Corp., a wholly owned subsidiary of Quad Graphics, Inc., Fernley, Nevada, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing a discriminatory rule in its "Employee Guidelines for U.S. Employees" corporate safety program policy no. 24 prohibiting employees from wearing baseball caps except those with the Company's logo and with the bill facing forward.

(b) Telling employees they are being reassigned from one press machine to another because of the employees' protected concerted social media activities that included comments supportive of the Union.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the discriminatory rule in "Employee Guidelines for U.S. Employees" corporate safety program policy no. 24 prohibiting employees from wearing baseball caps except those with the Company's logo and the bill facing forward.

(b) Within 14 days after service by the Region, post at its Fernley, Nevada facility, copies of the notice marked "Appendix."[5] Copies of the notice, on forms provided by the Regional Director for Region 32, after being signed by the Company's authorized representative, shall be posted by the Company and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as email, posting on an intranet or an internet site, or other electronic means, if the Company customarily communicates with its employees by such means. Reasonable steps shall be taken by the Company to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Company has gone out of business or closed the facility involved in these proceedings, the Company shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Company at any time since February 18, 2012.

Dated at Washington, D.C. July 31, 2013

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

---

[5] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT do anything to prevent you from exercising the above rights

WE WILL NOT maintain and/or enforce the discriminatory rule in our "Employee Guidelines for U.S. Employees" corporate safety program policy no. 24 prohibiting our employees from wearing baseball caps except those with the Company's logo on it with the bill facing forward.

WE WILL NOT tell our employees they are being reassigned from one press machine to another because of their protected social media activities including comments supportive of the Union.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL rescind the discriminatory rule in our "Employee Guidelines for U.S. Employees" corporate safety program policy no. 24 prohibiting our employees from wearing any baseball caps except those with the Company's logo on it with the bill facing forward and WE WILL provide you with written notification that this rule has been rescinded. ALL OUR EMPLOYEES are free to become or remain, or refrain from becoming or remaining, members of any labor organization.

WORLD COLOR (USA) CORP., A WHOLLY-OWNED SUBSIDIARY OF QUAD GRAPHICS, INC.