**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

WORLD COLOR (USA) CORP., A WHOLLY OWNED SUBSIDIARY OF QUAD GRAPHICS, INC.

Petitioner/Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD

Respondent/Cross-Petitioner

Nos. 14-1028, 14-1037

---

MOTION OF THE NATIONAL LABOR RELATIONS BOARD TO LODGE WITH THE COURT THE COMPANY'S BRIEF IN SUPPORT ITS EXCEPTIONS

To the Honorable, the Judges of the United States
Court of Appeals for the District of Columbia Circuit:

The National Labor Relations Board, by its Deputy Associate General Counsel, respectfully requests permission to lodge with the Court the Company's Brief in Support of its Exceptions to the Decision of the Administrative Law Judge (submitted to the Board in appeal of the judge's decision). In support of its motion, the Board shows:

1. As discussed in the Board's brief to the Court, the central issue in this case is whether the Company unlawfully maintained an overbroad policy that prohibits employees from wearing baseball caps bearing union insignia. The Board's brief filed with the Court today, quotes from page 17 of the Company's

brief in Support of its Exceptions to address an argument raised by the Company in its brief to the Court that employees could wear other union insignia such as buttons.

2.    The record in a Board case does not include briefs to the administrative law judge or briefs in support of exceptions.  *See* 29 C.F.R. § 102.45(b).[1]  In light of that fact, the Board's normal practice in cases where a party's briefs may prove helpful to the Court is to recommend that the Court permit the brief to be lodged separately from the formal record.

For the foregoing reasons, the Board requests that the Court grant its motion to lodge with the Court the Company's Brief in Support of its Exceptions (attached).

---

[1]  That section provides that the record before the Board consists of: "The charge upon which the complaint was issued and any amendments thereto, the complaint and any amendments thereto, motions, rulings, orders, the stenographic report of the hearing, stipulations, exhibits, documentary evidence, and depositions, together with the administrative law judge's decision and exceptions, and any cross-exceptions or answering briefs as provided in section 102.46, shall constitute the record in the case." 29 C.F.R. § 102.45(b).

/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1099 14th Street, NW
Washington, D.C.  20015
(202)-273-2960

Dated at Washington, D.C.
This 11th day of July 2014

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
RONALD J. HOLLAND, Cal. Bar No. 148687
ELLEN M. BRONCHETTI, Cal. Bar No. 226975
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone: 415-434-9100
Facsimile: 415-434-3947

Attorneys for Employer
QUAD/GRAPHICS, INC.

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 32

| | |
|---|---|
| WORLD COLOR (USA) CORP., a wholly owned subsidiary of QUAD/GRAPHICS, INC.<br><br>and<br><br>GRAPHIC COMMUNICATIONS CONFERENCE OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 715-C | Case Nos. 32-CA-062242<br>32-CA-063140<br><br>**RESPONDENT QUAD/GRAPHIC INC.'S BRIEF IN SUPPORT OF ITS EXCEPTIONS TO DECISION AND ORDER OF THE ADMINISTRATIVE LAW JUDGE**<br><br>[Hearing Date: June 4. 2013] |

# TABLE OF CONTENTS

Page

I. STATEMENT OF THE CASE ....... 1

II. STATEMENT OF FACTS ....... 1

A. The Quad Uniform And Hat Policy ....... 2

B. Quad Made A Collective Decision To Reassign John Vollene Unrelated To His Alleged Facebook Activity ....... 5

1. Quad Experienced An Operational Slow Down ....... 5

2. The Press Room Supervisors Met To Discuss Operator Reassignments ....... 6

3. Facebook Postings Were Not Discussed During The Press Room Supervisor Meeting ....... 6

C. Koch Advised Vollene Of The Reassignment In The January 2011 Timeframe ....... 7

D. The Personal Relationship Between Vollene And Bingham Extended Beyond Supervisor And Subordinate ....... 8

E. Vollene and Bingham's Facebook Relationship ....... 8

F. The Alleged Facebook Discussion and Alleged Threat ....... 9

III. LEGAL ARGUMENT ....... 10

A. The ALJ Incorrectly Found That Quad's "Hat Policy" Violated The Act (Exceptions 14-20) ....... 10

1. Rules Cannot Be Considered In A Vacuum – The ALJ Erred In Concluding That The Hat Policy Is Not Part of the Uniform Policy (Exceptions Nos. 14-15) ....... 10

2. Even If The Hat Policy Is Separate From The Uniform Policy, The ALJ Applied Incorrect Legal Standards To Conclude The Hat Policy Violated The Act (Exceptions Nos. 16-18) ....... 14

3. Had The ALJ Applied The Proper Legal Standard and Considered The Appropriate Evidence, The Only Possible Conclusion Is That Quad's Hat Policy Is Lawful (Exceptions Nos. 14-20) ....... 16

4. The ALJ Incorrectly Placed The Burden On The Employer To Establish "Special Circumstances" For Its Hat Policy (Exception No. 18) ....... 19

5. The ALJ's Remedial Order Improperly Usurps Quad's Undisputed Ability to Maintain Lawful Policies and Undermines Any Employer's Exercise of Its Legitimate Business Judgment (Exceptions Nos. 19 and 20) ....21

B. The ALJ Erroneously Concluded That Bingham's Statement Violated Section 8(A)(1) of the Act (Exceptions Nos. 1-13) ....22

1. Because There Is No Evidence of Protected Concerted Activity, The ALJ Erred In Concluding That Bingham's Statement Violated The Act (Exceptions Nos. 4, 5, 8, 9, 12, 13) ....22

2. The ALJ Failed To Properly Consider the Totality of the Circumstances In Concluding That Bingham's Alleged Statement Violated the Act (Exceptions Nos. 1-13) ....26

IV. CONCLUSION ....29

# TABLE OF AUTHORITIES

Page(s)

Cases

Advocate So. Suburban Hosp. v. NLRB
468 F.3d 1038 (7th Cir. 2006) .......... 24

Aroostook County Regional Ophthalmology v. NLRB
81 F.3d 209 (D.C. Cir. 1996) .......... 11

Boise Cascade Corp.
300 NLRB 80 (1990) .......... 20

Buel, Inc.
NLRB Case No. 11-CA-22936 .......... 23, 25

Burger King Corp v. NLRB
725 F.2d 1053 (6th Cir. 1984) .......... 14, 20

Coca-Cola Bottling Co.
311 NLRB 509 (1993) .......... 19

Corriveau & Routhier Cement Block v. NLRB
410 F.2d 347 (1st Cir. 1969) .......... 25

Dow Chemical Co. v. NLRB
660 F.2d 637 (5th Cir. 1981) .......... 28, 29

Five Star Transportation, Inc.
349 NLRB 42 (2007), 552 F.3d 46 (1st Cir. 2008) .......... 23

Frito-Lay, Inc.
NLRB Case No. 36-CA-10882 .......... 23, 25

Karl Knauz Motors, Inc.
358 NLRB No. 164 (2012) .......... 25

Liberty Homes, Inc.
257 NLRB 1411 (1981) .......... 21

Lutheran Heritage Village-Livonia
176 LRRM 1044 (2004) .......... 11

Martin Luther Memorial Home, Inc.
343 NLRB 646 (2004) .......... 16

Meijer, Inc.
318 NLRB 50 (1995) .......... 11, 15

Meyers Industries
281 NLRB 882 (1986) .......... 23, 25

Mueller Brass Co. v. NLRB
544 F.2d 815 (5th Cir. 1977) .......... 23

NLRB v. Columbus Marble Works
233 F.2d 406 (5th Cir. 1956) .......... 21

NLRB v. K&K Gourmet Meats, Inc.
640 F.2d 460 (3d Cir. 1981) .......... 28

NLRB v. Rockwell M'fing Co.
271 F.2d 109 (3d Cir. 1959) .......... 28

NLRB v. St. Francis Healthcare Center
212 F.3d 945 (6th Cir. 1993) .......... 14, 26

NLRB v. Wright Line, Inc.
662 F.2d 899 (1st Cir. 1981) .......... 23

Noah's New York Bagels
324 NLRB 266 (1997) .......... 15

North Hills Office Services
346 NLRB 1099 (2006) .......... 20

Parksite Group
354 NLRB No. 90, slip op. 5 (2009) .......... 24

Prill v NLRB
835 F.2d 1481 (D.C. Cir. 1987), 487 U.S. 1205 (1988) .......... 23

Republic Aviation v. NLRB
324 US 793 (1945) .......... 19

Sears Roebuck and Company
300 NLRB 804 (1990) .......... 16, 19

Smithfield Packing Co.
344 NLRB No. 1, slip op. (2004) .......... 26

Sunnyvale Med. Clinic
277 NLRB 1217 (1985) .......... 26

United Parcel Serv. v. NLRB
41 F.3d 1068 (6th Cir. 1994) ........ 26

United States ex. rel. El-Amin v. George Wash. Univ., F.Supp. 2d 135, 144-45 (D.C. Cir. 2007) ........ 24

Wheeling-Pittsburgh Steel Corp., 618 F.2d 1009, 1020 (3d Cir. 1980), 449 U.S. 1078 (1981) ........ 27

Wyman-Gordon Company, Petitioner v. NLRB, 654 F.2d 134, 145 (1st Cir. 1981) ........ 26

Other Authorities

"Employee Guidelines For U.S. Employees" ........ 2

National Labor Relations Board Rules and Regulations
§102.39 ........ 24
§102.46 ........ 1

National Labor Relations Board Statements of Procedure
§ 101.10(a) ........ 24

## I. STATEMENT OF THE CASE

Pursuant to Section 102.46 of the National Labor Relations Board's Rules and Regulations, Respondent Quad/Graphics, Inc. ("Quad") submits this brief in support of its Exceptions to the Report and Recommendations of the Administrative Law Judge William Cates issued on July 31, 2013.[1]

Quad excepts to the ALJ's findings and to his recommended Order, including that the Company take certain affirmative remedial action, including the posting of improper notices to employees. Those findings, conclusions, recommended order and notice requirements are not supported by the record, substantial evidence or the law.

As discussed below, the ALJ ignored relevant record evidence and misapplied applicable law to incorrectly conclude that: (1) Quad maintains and enforces an unlawful and discriminatory hat policy that prohibits employees' exercise of their Section 7 rights; and (2) even in the absence of any evidence of protected, concerted activity, a low level supervisor's lone statement to a good friend that "don't you think they know what you posted on Facebook" violated Section 8(a)(1) of the Act because it reasonably interfered with the free exercise of that employees' rights under the Act. Finally, the ALJ's remedial order requiring Quad to rescind its baseball cap policy impermissibly oversteps the Board's well-established role not to substitute its business judgment for the legitimate exercise of the Employer's. Accordingly, the ALJ's findings, conclusions, recommended order and notice should be vacated.

## II. STATEMENT OF FACTS

Quad is a multi-national printing corporation that puts ink on paper. (Rec: 140:4-6.)[2] On July 2, 2010, Quad acquired World Color (USA) Corp. Included in the acquisition was the Fernley plant location which prints retail newspaper inserts (*e.g.*, advertisements in

---

[1] Respondent's Exceptions are filed concurrently with this brief pursuant to Section 102.46 of the Board's Rules and Regulations.

[2] References to the transcript of the July 31 hearing on this matter are designated as "Rec: ___; to Joint Exhibits as "Joint Exh. ___; to the General Counsel's Exhibits as "GC Exh: ___; to Respondent's Exhibits as "Resp. Exh: ___; and to ALJ's Order and Report and Recommendations as ("ORD:page:line number.)

the Sunday paper). (Rec: 40:12-15.) At the time of the acquisition, the Fernley Press Room employees were represented by the Union. (Rec: 49:4-16.) A few months later, on October 4, 2010, a decertification petition was filed by Curtis Farrell, a Lead Press Operator. (Rec: 153:1-8.) A stipulated election occurred on November 30, 2010 with the employees voting to decertify the Union. (Rec: 117:25-118:2.) The Certification of Election Results was ultimately issued on February 1, 2011. (Rec: 23:17-19, 50:3-7.)

### A. <u>The Quad Uniform And Hat Policy</u>

Quad maintains a Company-wide uniform policy which includes some mandatory and some optional components. (*See* Joint Exhs. 2, 4-5.) Known as "Quad/Blues," the minimum required uniform consists of navy blue pants, shorts or skirt and a navy blue shirt with the Quad logo and employee name. In terms of further restrictions, the uniform policy merely states that "you are required to dress and groom professionally at all times." (*See* Joint Exh. 2, p. 12.) The Quad/Blues serves as a reminder that everyone employed by Quad is a production employee regardless of their role and promotes inclusion at every level of the Company – from the Press Room floor in Fernley, Nevada to Corporate Headquarters in Sussex, Wisconsin. The Company-wide uniform policy described above is written, among other places, in the "Employee Guidelines For U.S. Employees" ("Employee Guidelines"). (*See* Joint Exh. 2.)

The Government concedes that Quad's uniform policy is lawful,"not in dispute" and that it does "not have a problem with an employer asking employees to wear a uniform that depicts a logo of the Company." (Rec: 37:18-21: 103:25-104:1, 133:21-22.) The Government further does not dispute that Quad may require employees to wear uniforms of a certain color, only containing the Company's logo and an employee's name. (Rec: 105:18-106:2).

As mentioned above, the uniform policy allows employees to wear "optional" layers of clothing, such as vests, t-shirts and sweaters. The policy permits such additional gear, so long as the additional optional layers contain the Quad logo. (*See* Joint Exh. 2.)

All such optional components of the Quad/Blues policy may be purchased through Quad's website. (*See* Joint Exhs. 2, 4 and 5.)

Given that Quad's uniform policy applies to all classifications of employees, different employees may have different uniform requirements. The uniform policy states that there may be "additional or different" uniform requirements depending on an employee's job classification. (Joint Exh. 2.) For example, some of Quad's employees work in more safety-sensitive positions than do others. In the production areas of Quad's plant locations, printing presses operate at high rates of speed. (Rec: 206:12-14.) Due to the obvious dangers of bodily injury posed by this equipment, Quad adopted an additional policy applicable to production employees. The policy provides that "all hair hanging past the bottom of the collar must be secured to the head." (*See* Joint Exhs. 2 and 5.) Further, even if "hair does not hang past the collar but could potentially be caught in equipment, it must be secured with a hairnet or by other means." (*See* Joint Exhs. 2 and 5.) Ponytails are strictly forbidden and facial hair longer than the base of the neck must be secured. (*See* Joint Exhs. 2 and 5.)

Due to the increased frequency of employees wearing hats in the workplace, in the mid-2010 timeframe, Quad made the decision to formalize a written Company-wide hat policy (set forth below). (Rec: 206:1-4.) This policy applied to all Quad facilities throughout the country. (Rec: 203:1-10,207:11-20.) Three departments were involved in formulating this new corporate policy: Safety, Security, and Human Resources. (Rec: 204:10-205:25, 211:21-212:2.) Safety wanted to ensure "that the hat was appropriate for the production floor, safe, as well as making sure that it could secure hair to the head." (Rec: 206:5-11.) With the operation of high-speed presses at the plant locations, the Safety Department had concerns, among others, about hats falling into the equipment. (Rec: 206:12-17.) Security had concerns about gang insignia and symbolism, specifically the colors of the hats and the direction of the bill. (Rec: 206:18-207:6.) Human Resources "wanted to ***make sure the hat aligned with the uniform policy from a presentation standpoint***." (Rec: 207:7-14.)(Emphasis added.)

The three departments ultimately decided that, as an optional part of the uniform (like a vest or a sweater) and as an optional means of securing hair that hangs past the bottom of the collar, all employees companywide who needed to secure their hair to their head for safety purposes would be allowed to wear hats with Quad's logo. The hat policy, in effect during the relevant timeframe, states:

> All hair hanging past the bottom of the collar must be secured to the head while in the production areas. If hair does not hang past the collar but could potentially get caught in our equipment, it must be secured to the head with a hairnet or by other means. Baseball caps are prohibited except for Quad/Graphics baseball caps with the bill facing forward. Ponytails are strictly prohibited. Facial hair longer than the base of the neck must be secured. (Joint Exh. 2.)

Consistent with Quad's uniform policy, just as employees cannot wear optional vests with a non-Quad logo, employees cannot wear baseball caps displaying logos for sports teams, clothing apparel, vacation destinations or other non-Quad logos.

While the hat policy is consistent with and is a part of the uniform policy, the hat policy is spelled out specifically in the Safety Section of the Employee Guidelines, which appears on page 17 – five pages after the uniform policy. (*See* Joint Exh. 2.)

On February 8, 2011 through a memo and during meetings with employees who worked at the Fernley location, the uniform policy (which included the optional Quad hat for certain employees) was announced to employees and rolled out over the next few weeks. (Rec: 208:21-209:6; *See* Joint Exhs. 4 and 5) The policy has remained in place and unchanged since the 2011 roll-out. (Rec: 21:12-22.) The memorandum directed to "All Fernley Employees" explained the mandatory requirements of the uniform (Quad shirt/blue plants or skirt) and the optional components which are available for purchase (jackets and hats). Nowhere does the memorandum limit employees from wearing any gear to demonstrate union support. (*See* Joint Exhs. 4 and 5). Employees who testified at the hearing all reasonably understood that the hat was an optional component of Quad's uniform policy. (Rec: 64:13-20, 121:15-22, 129:17-21.)

In addition to the fact that the hat policy does not expressly prohibit union insignia, the Government presented no evidence that Quad's hat policy prohibits employees from

demonstrating union support. For example, as stated, employees are not required to wear a hat; employees can wear anything (safety compliant) to secure their hair to their head, and their chosen hair-securing device can be any color with any symbol.[3]

Finally the Government presented no evidence or allegations that Quad ever enforced its hat policy in a discriminatory manner. In fact, the only evidence presented at trial was that Quad consistently enforces its hat policy to prohibit employees from wearing any logo other than the Quad logo. (Rec: 100:18-102:1.) It is also undisputed that Quad's uniform policy and its hat policy applies to all Quad employees throughout the country.

**B. Quad Made A Collective Decision To Reassign John Vollene Unrelated To His Alleged Facebook Activity**

**1. Quad Experienced An Operational Slow Down**

Since its inception, the Fernley facility has housed five Gravure printing presses. (Rec: 145:11-22; *See* Joint Exh. 1.) Four shifts operate the presses and are designated by color: Red; Yellow; Blue; and Green. (Rec: 42:20-24, 141:10-13.) Each shift is 12 hours in duration and rotates between nights and days, weekdays and weekends. (Rec: 42:20-24, 141:14-142:3.) Each press is assigned a Lead Press Operator. (Rec: 146:4-7.) The Lead Press Operator runs a five-person "crew" and is responsible for safety, quality, speed, set-up of the machine, decision-making, and interaction with the Press Room Supervisors. (Rec: 45:6-11, 90:16-19, 146:8-19.)

Due to the continued economic downturn in the 2010 timeframe, the Fernley plant experienced a significant reduction in customer orders which was expected to impact the facility in the first quarter of 2011. (Rec: 148:5-10.) In an effort to prevent lay-offs, and simultaneously maximize operational capacity, the decision was made that the Press Room employees operate three presses on a consistent basis, rather than five. (Rec: 146:1-3, 147:5-14, 149:4-8.)

[3] One of the Government's witnesses testified that he personally did not wear any union insignia on his hat at work. (Rec: 123:5-8.) However, the Government presented no admissible evidence that Company policy prohibits employees from wearing union insignia on their hats or elsewhere.

**2. The Press Room Supervisors Met To Discuss Operator Reassignments**

In the Fall 2010 timeframe, Pressroom Manager Ernie Koch called a meeting of the Press Room Supervisors. (Rec: 147:5-14.) There were eight attendees at this meeting: Koch, four Shift Supervisors, two Technical Supervisors, and the Training Supervisor. (Rec: 150:17-19.) Randy Bingham, as the Yellow Shift Supervisor, was among those in attendance. The purpose of the meeting was to identify individual operators (including Lead Press Operators) and discuss their respective strengths and weaknesses in order to evaluate press rotations/reassignments that matched skill sets, personal dynamics, and equipment. (Rec: 147:15-25, 149:4-8.) Koch wanted all of the Press Room Supervisors (Shift, Technical, and Training) present to effectively critique employee performance. (Rec: 149:9-12, 150:7-15.)

**3. Facebook Postings Were Not Discussed During The Press Room Supervisor Meeting**

The reassignment discussion focused on three presses: G-201, G-203, and G-206. (Rec: 148:11-20.) Presses G-201 and G-203 were considered the "workhorse presses" as they were the fastest and most efficient. (Rec: 148:21-24.) The ultimate goal of the reassignment was to put the most qualified, best teams together for each of the three above-referenced presses in an effort to maximize capacity. (Rec: 149:4-8.) All attendees at the Fall 2010 meeting provided input regarding the operator rotations/reassignments. (Rec: 150:20-24, 175:24-176:3.)

In the Fall of 2010 and for approximately eight years prior to that, John Vollene worked on the Yellow Shift, assigned to Press G-201, and reported directly to Bingham for seven of those eight years. (Rec:43:14-44:1.) Koch testified that Vollene's performance on the press was "average." (Rec: 152:2-6.) Because of Press G-201's "workhorse" status, coupled with the operational slow-down, an "average" Lead Press Operator on this press was insufficient for Quad's business needs going forward. Koch and the Press Room Supervisors were looking beyond the status quo and seeking the highest quality individuals that would take the initiative to maximize productivity on Press G-201. (Rec: 147:19-25,

152:7-11.) Thus, during the Fall 2010 Supervisor meeting, the collective decision was made to move Vollene from Press G-201. (Rec: 152:12-19, 178:24-179:4.) The press operator reassignments were not limited to Vollene, Press G-201, or the Yellow Shift. (Rec: 78:3-16, 152:20-25.) All presses and all shifts experienced reassignments; in fact, four out of five Lead Press Operators on the Yellow Shift were reassigned.[4] (Rec: 56:11-22, 155:11-20, 179:5-9.)

During the reassignment discussions, it is undisputed (and the ALJ concluded) that Vollene's alleged Facebook, social media activity, or Union activity was not discussed and that Koch never discussed Facebook postings with any employee. (ORD: 5:26-30; Rec: 150:25-151:14, 157:6-11, 170:10-17, 176:7-18.) It is also undisputed that the reassignment decisions were based solely on individual operator performance. (Rec: 157:6-11.) Significantly, the Government did not argue that Vollene was reassigned because of his alleged Facebook postings (or because of his engagement in any other protected activity) and the ALJ did not conclude otherwise.

### C. Koch Advised Vollene Of The Reassignment In The January 2011 Timeframe

Although the reassignment was determined in Fall 2010, the implementation was delayed until after the busy holiday advertising season. (Rec: 156:15-20.) In the January 2011 timeframe, Koch called Vollene into the Press Room Manager's office to discuss his reassignment. (Rec: 156:12-25, 160:21-25, 170:25-171:4.) As Koch testified, Vollene "was not pleased with the decision" and asked why the moves were being made. (Rec: 157:1-11, 170:22-24.) Koch responded that he and all the Supervisors previously met to identify the strengths and weaknesses of the press operators and the reassignments were determined based on that meeting. (Rec: 157:6-11.) At no time during this meeting with Koch did Vollene complain that the reassignment was retaliatory due to Vollene's alleged

[4] (1) Vollene from G-201 to G-204; (2) Steve Schaefer from G-203 to G-205; (3) Rich Garza from G-204 to G-203; and (4) Billy Cleland from G-204 to G-201.

Facebook, social media, or Union activity. (Rec: 158:9-12.) Following the reassignment, Vollene remained a Lead Press Operator on the Yellow Shift, earned the same wages, and performed the same job duties and responsibilities. (Rec: 81:1-8.)

### D. The Personal Relationship Between Vollene And Bingham Extended Beyond Supervisor And Subordinate

Bingham was Vollene's supervisor for almost 8 years. It was widely known that Vollene was active with the Union and was on the first bargaining committee as far back as 2007. (Rec: 49:14-25.) Outside of work, Vollene and Bingham have been close (if not the best of) friends for more than a decade. (Rec: 74:22-75:1.) They talked "outside of work" and remained in contact although neither works for Quad and Bingham has moved away from the Fernley, Nevada area. (Rec: 72:17-25, 181:16-19.) For example, Bingham invited Vollene to his son's high school graduation, and they discussed plans to spend time together following his testimony at the Fernley trial. (Rec: 73:7-18, 74:19-75:7.) As noted below, the ALJ erroneously ignored the fact that Vollene and Bingham were close friends when he concluded that Bingham unlawfully threatened him.

### E. Vollene and Bingham's Facebook Relationship

Given that Vollene and Bingham are close friends, they are also friends on Facebook.[5] Vollene is friends with no other Quad supervisor on Facebook. (Rec: 54:4-7). The Government presented no evidence regarding the frequency of Vollene and Bingham's interchange on Facebook or whether Bingham even regularly checks his Facebook account. Without presenting the actual Facebook postings themselves, Vollene claimed that beginning in September 2010, he made unspecified comments about Quad and about the Union. (Rec: 53:4:20.) The Government's most specific evidence of these comments are that Vollene commented on another employee's Facebook post about the Company in September 2010 "and it grew from there over the next 5-6 months." (Rec:

---

5 In order to be "Facebook friends" the two "friends" must willingly agree to share posts and information. Vollene chose to share all of his Facebook posts with his supervisor, Bingham.

53:18-25). Again without presenting any evidence as to the content of the Facebook posts, Vollene said that an unknown number of discussions were "heated at times, a lot of funny jokes posted." (Rec: 52:18-20.) Vollene further testified that "no supervisors participated in these posts or communications." (Rec: 54:2-4.) The Government presented no evidence that these posts were pro-union posts and no evidence that Bingham, or any other supervisors at Quad, knew about these specific posts.[6]

**F. The Alleged Facebook Discussion and Alleged Threat**

A few days after the job reassignments were in effect, the Government claims that Vollene approached Bingham and asked why he was reassigned. During this interchange, Vollene claims Bingham told him in response "don't you think that they know about what you posted on Facebook." (Rec: 58:17-59:1.) No other witnesses were present for this conversation. The Government never presented any of the comments that Vollene allegedly posted on Facebook about the Company or the Union and did not call another employee witness who participated in these Facebook discussions to corroborate Vollene's claim about the substance of the postings. The Government also failed to present evidence (and did not ever claim) that other employees were reassigned to other positions because of their postings on Facebook. The evidence also demonstrates that Vollene and Bingham continued to remain friends on Facebook (and in real life) after this statement was made. It is this lone statement which the Government alleges (and the ALJ found) coerced Vollene and therefore violated Section 8(a)(1) of the Act.

6 Bingham testified generally that he knew that Vollene "talked about work" and "criticized" the Employer on Facebook. (Rec 182:14-16.) He credibly denied recollection of Vollene discussing the Union on Facebook. (Rec: 183:4-12.) However, the Government presented no evidence as to what Vollene actually said "about work" or to "criticize the company," when he made such remarks and the number of times such comments were made. Such vague evidence is woefully insufficient for the ALJ to conclude that the Government met its burden to establish that Vollene engaged in "protected concerted activity."

## III. LEGAL ARGUMENT

### A. The ALJ Incorrectly Found That Quad's "Hat Policy" Violated The Act (Exceptions 14-20)[7]

The Government did not contest the lawfulness of the uniform policy or contest the optional nature of the hat policy. Nonetheless, in a tortured interpretation of the policy, the ALJ determined Quad's optional hat policy "prohibits employees from displaying a union logo or insignia" and thus violates Section 8(a)(1) of the Act. The decision is erroneous because the ALJ (1) unreasonably concluded that Quad's integrated uniform and hat policy are "separate and distinct"; (2) improperly "cherry picked" certain sentences of Quad's hat policy to find a violation where none exists; (3) failed to apply unanimous Board precedent which allows employers to maintain lawful, non-discriminatory uniform policies; and (4) improperly shifted the burden to require that Quad establish "special circumstances" for its hat policy absent evidence that its hat policy is discriminatory or that Quad prohibits employees from wearing union insignia at work. (*See* Exceptions Nos. 14-20). Further, if upheld, the ALJ's decision and order radically expands the power of the Board to rewrite lawful Company uniform and dress code policies. His decision cannot stand.

#### 1. Rules Cannot Be Considered In A Vacuum – The ALJ Erred In Concluding That The Hat Policy Is Not Part of the Uniform Policy (Exceptions Nos. 14-15)

First, in finding that Quad's hat policy violated the Act, the ALJ erroneously concluded the "uniform and hat policies are two separate distinct policies."[8] In reaching this conclusion, the ALJ made improper and unreasonable findings of fact and misapplied Board precedent.

It is well settled that when assessing the lawfulness of work rules the Board must "give the rule a reasonable reading…it must refrain from reading particular phrases in

---

7 The specific Exceptions referred to herein are set forth fully in Respondent's Exceptions filed concurrently with this brief.

8 The ALJ's decision is particularly puzzling because it appears to be inconsistent with how the ALJ viewed this case at the hearing. At the hearing, the ALJ identified the issue before him as whether the Company's hat policy, which "rounded out" the Company's uniform policy, violated the Act. (Rec:134:5-135:3.)

isolation, and it must not presume improper interference with employee rights." *See* Lutheran Heritage Village-Livonia, 176 LRRM 1044 (2004). For example, in Aroostook County Regional Ophthalmology v. NLRB, 81 F.3d 209 (D.C. Cir. 1996), the Court of Appeal overturned the NLRB's conclusion that the employer maintained overbroad work policies in violation of the Act. In reaching this conclusion, the court held that the Board's refusal to read the challenged policy in the context of another policy contained in the employer's office manual was unjustified, even though the two provisions were in different sections of the manual, were seventeen pages apart, and did not reference each other. The court found that the challenged policy was "entirely reasonable **when read in context with the accompanying provision"** and therefore reversed the Board's finding to the contrary. Id. at 213-14 (emphasis added).

Similarly in Meijer, Inc. 318 NLRB 50 (1995), the NLRB upheld the ALJ's decision concluding that the Company's hat policy, which prohibited employees from wearing insignia on clothing unless approved by the Company, was lawful and was part of the uniform policy even though the hat policy was not referred to in the employee handbook section titled "Proper Dress and Grooming." In fact, the hat policy was nowhere in the handbook and was distributed to employees in a memo that was posted on the time clock. The ALJ concluded "the hat policy became part of the uniform and maintained Respondent's desired uniformity." Id. at 57.

Here, like the Board in Aroostook County Regional Ophthalmology, the ALJ failed to provide reasonable context to the rules and improperly concluded the hat policy is not part of the uniform policy because: (1) the hat policy is in the safety section of the employee guidelines, where the "dress code" is set forth in a different section of the employee guidelines (five pages apart); (2) the hat policy was formulated by the safety, security and human resources department with emphasis on safety (to secure the hat to the head) and security (to prevent insignia, color and direction of the bill to encourage gang activity). (ORD: 10:1-14.) Specifically, the ALJ concluded that "if the hat policy was just to make the optional hat color coordinated with the uniforms then the hat policy would

have been made part of the dress code and placed with the dress code in the Employee Guidelines…" (ORD:10-10-14.) His analysis misses the mark. The ALJ's reasoning disregards the record evidence establishing the Company's legitimate, undisputed reasons for the implementation of the nationwide hat policy and the record evidence establishing that its placement in the the safety section did not mean the Company intended the hat policy to be separate and distinct from the uniform policy. The ALJ's decision also ignores Board law which requires a finder of fact to consider Company policies as a whole and to consider the context in which rules are created, understood, distributed and enforced. Had the ALJ correctly considered the evidence presented in context as he is required to do under Board precedent, the ALJ would have correctly concluded that mere placement of the hat policy in the safety section cannot legitimately lead to a conclusion that the hat policy is not a part of the uniform policy.

First, the undisputed evidence demonstrates that three different departments met to discuss the addition of the hat policy and the necessity for the rules. After those discussions, as for placement, the hat policy landed in safety section of the Employee Guidelines because in Quad's view "that is where it made sense" – not because it intended the hat policy to separate and distinct from the uniform policy. Specifically, as detailed in Ott's undisputed testimony:

> Q. There seems to be some question about why the hat policy has been placed where it's been placed within the employee handbook.
>
> A. Uh-huh.
>
> Q. Can you enlighten us? Can you tell us why?
>
> A. At the time because when the three teams got together, security such a - - safety is such a priority for Quad Graphics, we just felt it was best placed there.
>
> Q. Yet the hat remains an optional item within the uniform policy.
>
> A. Yes. (Rec: 209:20-210:5.)
>
> *        *        *        *
>
> Q. And why was the baseball cap rule placed in the safety policy instead of the uniform policy?
>
> A. When we were discussing the policy, safety, again, is just a number one priority for us. We felt it best placed there. (Rec: 220:17-20.)

This testimony is uncontroverted. Moreover, the placement in the Safety Section makes perfect sense given that hats can be used to secure hair to the head in line with Quad's safety standards. This testimony was erroneously ignored by the ALJ and if properly considered, the only reasonable conclusion is that the hat policy is part of the uniform policy.

Second, the uniform policy itself says that "certain positions may have additional or different uniform requirements" making clear that position-specific uniform requirements may be, and are, addressed in other sections of the handbook. The hat policy is directed to attire on the production floor.

Third, the overwhelming evidence established that the hat is part of the uniform policy, just one of several "optional" items of attire. This is buttressed by the cumulative evidence that (1) as with other optional pieces of the Quad uniform, employees could purchase the hats at the same web site where they purchased all other components of the Quad uniform; (2) as with other optional items of the uniform policy (such as a sweater or vest), if they are to be worn, the hats must have the Quad logo; (3) when the Company presented the uniform policy to the Fernley employees in writing, it explained that the hat was an "optional" component of the uniform; (4) the Government's own employee witnesses confirmed they believed the hat was an optional part of the uniform policy; and (5) employees who are subject to the hat policy are still also subject to the requirements of the uniform policy (i.e., employees are not able to ignore the uniform policy because the hat policy also applies to them).

If that weren't enough, at hearing, Counsel for the General Counsel *stipulated* that the hat policy was intended to be part of the uniform. (Rec: 237:6-238:13.) Specifically, Counsel for the General Counsel stipulated "the HR policy was to bring the hat policy in line esthetically and color purposes and for those matters that would make it, for a lack of a better way, appealing to the eye. That it's all navy blue slacks, navy blue button up shirt and a navy blue baseball cap." (Rec: 237:6-11.) This stipulation is not surprising given that the addition of a piece of clothing or optional attire cannot be reasonably construed to

be anything other than the uniform/dress code. The ALJ simply ignored this stipulation in concluding that the uniform and hat policies are separate and distinct.

Finally, based on the Government's statements during trial, if the collective decision was made to put the hat policy in the same section of the Employee Guidelines as the uniform policy, the Charge would have been dismissed, no Complaint would have been issued (or amended), and no trial would have occurred. (*See* Rec: 38:10-16, 103:25-104:14.)

But in finding the hat policy separate, the ALJ disregarded these factors, and improperly read the hat policy out of context and without regardto the "reality of workplace" analysis that the Board requires. The ALJ's conclusion is not based on a proper consideration of the evidence. Had the ALJ correctly concluded the hat policy was part of the uniform policy, there would be no basis for a violation of the Act because the Government is not contesting the lawfulness of the uniform policy. Accordingly, the ALJ's decision should be reversed and the charge dismissed.

**2. Even If The Hat Policy Is Separate From The Uniform Policy, The ALJ Applied Incorrect Legal Standards To Conclude The Hat Policy Violated The Act (Exceptions Nos. 16-18)**

Even if the ALJ correctly found the hat policy was separate and distinct from the uniform policy, it is still part of the Company's dress code. Thus, the ALJ's decision cannot stand because it is based on an incorrect application of the law resulting in faulty legal conclusions.

A uniform policy must be enforced consistently and cannot be used to target union insignia. *See* NLRB v. St. Francis Healthcare Center, 212 F.3d 945 (6th Cir. 1993). Thus, Quad may lawfully prohibit the wearing of hats, except for hats with the Quad's logo so long as the prohibition applies to all other types of hats. *See*, e.g., Burger King Corp v. NLRB, 725 F.2d 1053 (6th Cir. 1984) (the employer did not violate the NLRB since it consistently enforced a policy requiring the wearing of uniforms only with authorized name tags).

The Board has implicitly recognized that an employer may promulgate and enforce a nondiscriminatory uniform rule. Further, the Board has specifically allowed employers to require employees to wear uniforms with company-approved logos so long as the rules do not otherwise prohibit employees from wearing union insignia. For example, in Meijer Inc., 318 NLRB 50, certain employees were required to wear hats. The only hats permitted were those authorized by the Company – occasionally the hats were supplied by vendors with vendor colors and logos. Otherwise, the Company prohibited employees from wearing union logos and other personal logos on their hats. The ALJ concluded, and the NLRB affirmed, that "the wearing of hats bearing the Union's logo, I believe, stands on different footing" (than a policy which prohibits pins on uniforms), that the Company's hat requirement "became part of the uniform" and that the employer did not violate the act in maintaining and enforcing a policy that prohibited union logos on hats.[9] *See also* Noah's New York Bagels, 324 NLRB 266, 275 (1997)(finding that an employer lawfully enforced policy requiring employees to wear a company t-shirt and lawfully insisted that she remove a company shirt with an added phrase). Indeed, the Board has never held that, where an employer lawfully maintains and consistently enforces a non-discriminatory policy requiring employees to wear a company uniform or other article of clothing, its employees have a right under Section 7 to disregard the policy and wear union apparel in place of a company uniform.

However, here, the ALJ concluded that notwithstanding the fact that the hat policy does not expressly prohibit employees from wearing union insignia at work, on their hat or otherwise, Quad's hat policy is unlawful on its face because it prohibits union logos "or for that matter other protected messages on their hats." (ORD: 10:15-20.) The ALJ reached

[9] In Meijer, the ALJ engaged in the "special circumstances" analysis because Meijer prohibited employees from wearing union insignia of all kinds at work. Therefore, the ALJ found that the employer could prohibit employees from wearing hats with union identification in customer areas of the store, other than in parking lots. The special circumstances analysis is not applicable here because in this case, there is no record evidence that demonstrates Quad prevents employees from wearing union insignia on their hats or on other items of their person at work.

this conclusion relying simply on the text of the rule which says "baseball caps are prohibited except for Quad/Graphics baseball caps." However, the Government presented no evidence that Quad's policy prevents employees from wearing union insignia on their hats and no evidence that Quad prevents employees from securing their hair with devices that have union insignia on them. Instead, the policy simply prevents employees from replacing the Company hat with any hat of their own choosing. The ALJ's decision is erroneous and, if upheld, effectively prevents an employer from requiring employees to wear hats with Company logos without the showing of special circumstances. Essentially, the ALJ's decision allows employees to pick and choose what articles of clothing to wear regardless of a dress code or uniform policy – a right no other Board decision has conferred upon employees.

**3. Had The ALJ Applied The Proper Legal Standard and Considered The Appropriate Evidence, The Only Possible Conclusion Is That Quad's Hat Policy Is Lawful (Exceptions Nos. 14-20)**

Because the ALJ erroneously found that the hat policy was facially invalid, the ALJ did not engage in the appropriate legal analysis and compounded his error.[10] In the absence of a facially invalid rule, to find a work rule unlawfully overbroad, the Government must show one of the following: (1) the rule has been applied to restrict the exercise of Section 7 activity; (2) employees would reasonably construe the language to prohibit Section 7 activity; or (3) the rule was promulgated in response to Section 7 activity. Martin Luther Memorial Home, Inc., 343 NLRB 646, 647 (2004). The only relevant inquiry into the lawful uniform policy is whether it was discriminatorily enforced. *See* Sears Roebuck and Company, 300 NLRB 804 (1990).

First, there is no evidence that the hat policy has been applied to restrict Section 7 activity. The Government presented no evidence that employees have been prohibited

[10] Even though the ALJ's decision cites no evidence as to why Quad's policy is "discriminatory" (presumably because there is no such evidence in the record), his remedial order demands that Quad "rescind the discriminatory rule…" (*See* ORD: 12:25-30.) Quad further excepts to the judge's reference to the rule as "discriminatory" when he appears to have made no legal or factual finding in this regard.

from adorning the hat (or any other parts of their person or uniform) with union insignia. In fact, the *only* admissible evidence was that Quad places limitations on accessories or adornments (including hats) when the restriction is necessary to comply with legitimate safety policies (*e.g.*, no pins or buttons on the production floor that could fall into the equipment). (*See* Joint Exhs. 2 and 5.) In addition, the Government presented no evidence of actual interference, coercion, or restraint in employees' exercise of their Section 7 rights. Indeed, there was no evidence that any employee attempted to or even desired to wear union logos or insignia in the workplace and were denied that opportunity.

Second, employees would not reasonably interpret the hat policy as restricting Section 7 activity. Even assuming that the uniform policy is separate from the optional hat policy (which it is not and not even considered as such by employees), all employees are still subject to the uniform policy. While Quad's uniform policy (and the hat policy) require all mandatory and optional items of clothing to have the Quad logo insignia on them, there is no express limitation which prevents employees from also wearing union insignia such as stickers, pins, bracelets, socks on their person.[11] Therefore, even if the hat policy prohibited union insignia from being placed on it (which it does not), there is no evidence that the policy otherwise interfered with employees' ability to wear union insignia on any other part of their person.

It appears the ALJ concluded that the hat policy was overbroad and unlawful because he believes employees have a Section 7 right to wear clothing with union logos at work regardless of employees ability to wear other union insignia at work. If this analysis is accepted, then employers would never be able to enforce a dress code of any kind without a showing a special circumstances. Indeed, according to the ALJ's interpretation of the law, a dress code of a plain white T shirt with no writing would now be unlawful as it prevents an employee from wearing a union shirt. That is simply not the law.

---

[11] The failure of the Government to adduce such evidence at hearing is a critical roadblock to the ALJ's ultimate finding of a violation of the Act.

Further, the record evidence clearly establishes that Quad employees understand that hats are an optional uniform item with the sole purpose of offering employees a variety of options of how to secure hair to the head. (*See* Joint Exhs. 2-3, and 5.) For example, when employees at Fernley were presented with Quad's uniform policy, they were told that as with the mandatory and other items of the uniform, hats, while optional, must only contain the Quad logo. Based on how the hat policy was presented initially, employees would reasonably interpret the policy requiring Quad logo hats only as a legitimate means of ensuring consistency with the Quad/Blues uniform requirements. Further, while the Government called several employee witnesses to testify, significantly, none of them testified that the hat policy prohibited the employee from engaging in protected Section 7 activity at work. That is because nothing in the hat policy prohibits employees from doing so, it only prevents them from replacing the Company hat with any other type of hat, including a union hat.

The fact that Quad maintains a policy allowing employees to wear hats with a Quad logo (as opposed to any other logo they wish) cannot be reasonably viewed by any employee as a policy in place simply to eliminate their exercise of Section 7 rights. That is especially true here where the policy does not otherwise prohibit employees from wearing union insignia on their heads. Rather, the only reasonable purpose of the policy from the employees' perspective is to allow them the privilege to protect their heads from the known hazards of the printing floor and to wear a complete uniform.[12]

The Government also presented no evidence that Quad promulgated the rule in response to Section 7 activity. In fact, the evidence demonstrates exactly the opposite. It is undisputed that Quad's nationwide hat policy was implemented for legitimate business reasons and uniformly applies to all employees throughout the Company – it was not put in place just at Fernley in response to union activity. It is undisputed that Quad's policies

12 According to the Government's own evidence industry-wide, employees who work in production areas of the printing industry wear hats because "the worst thing to get in your hair is paper, dust and grease." (Rec: 63:18-23.)

apply to Fernley employees as they do for anyone else who works at Quad throughout the country.

In fact, it is also undisputed that while Quad's nationwide hat policy was implemented at all other Quad facilities throughout the country in 2010, Quad delayed implementing the identical hat policy at the Fernley facility until after the certification of decertification election results was issued in February 2011. Indeed, if Quad's motivation to implement the policy was to prevent expression of union support, Quad would have certainly implemented it earlier – as prior to the change, Fernley employees wore hats with logos of their choosing. (Rec: 118:8-10.)

Finally, there is no evidence that Quad applied the policy in a discriminatory manner. Rather, ***the Government's witnesses testified that the policy was consistently applied***. Indeed, the evidence demonstrated that an employee was required to remove a Green Bay Packers hat on the production floor. (Rec: 100:18-102:1.)

The ALJ failed to consider any of these factors in concluding that Quad's hat policy violated the Act. A proper review of the evidence and correct application of the law easily demonstrates that the Government failed to establish Quad's hat policy violates the Act.

**4. The ALJ Incorrectly Placed The Burden On The Employer To Establish "Special Circumstances" For Its Hat Policy (Exception No. 18)**

It is well settled that where an employer prohibits employees from wearing union insignia while at work, it must establish "special circumstances" that justify this prohibition. Republic Aviation v. NLRB, 324 US 793, 801-803 (1945). -However, this is not a union insignia case but instead a dress code case. Employers may establish uniform or dress code requirements without a showing of special circumstances. Sears Roebuck & Co., 300 NLRB 804, 807 (1990); Coca-Cola Bottling Co., 311 NLRB 509, 515 (1993).

Moreover, the law is equally well settled that there is no absolute right to wear union insignia, or other attire in the workplace. Rather, the Board law has struck a delicate balance between employees' right to self-organize and an employer's right to maintain rules that further the objectives of its business. For that reason, the special circumstances

analysis has been applied where (1) an employer without a uniform or dress code prohibited employees from wearing union insignia or attire; or (2) an employer with a uniform or dress code policy prohibited employees from adding union insignia (such as a pin) to the required attire. *See* Boise Cascade Corp., 300 NLRB 80, 84-85 (1990)(absent a dress code, employer unlawfully prohibited t-shirts with protected message); North Hills Office Services, 346 NLRB 1099 (2006)(absent a requirement that a uniform be worn by night shift employees, employer unlawfully directed them to remove union t-shirts); Burger King Corp. v. NLRB, 725 F.2d 1053 (6th Cir. 1984)(employer lawfully prohibited employees from wearing union buttons on uniforms). In this case, the ALJ improperly placed the burden on the Employer to establish special circumstances in the absence of a policy that prevented union insignia. (ORD:11:13-15.) His ultimate conclusion that the Company's hat policy violated the Act for the sole reason that Quad failed to establish special circumstances is reversible error.

The Government presented no evidence to support either scenario that would require the Employer to establish "special circumstances" to avoid a violation of the Act. It is undisputed that the uniform policy nor the hat policy expressly prohibit union insignia. Rather, the uniform policy simply states that "employees are required to dress and groom professionally at all times. While accessorizing the uniform in good taste and in accordance with safety rules is acceptable, your name (first and last) and the Quad/Graphics logo must show at all times." (*See* Joint Exh. 2). While disregarding this evidence, the ALJ erroneously concluded the hat policy prohibits employees exercising their Section 7 rights. His decision is erroneous and must be reversed.[13]

[13] In fact, this aspect of the ALJ's decision goes far beyond the allegations of the Complaint and well beyond any record evidence.

**5. The ALJ's Remedial Order Improperly Usurps Quad's Undisputed Ability to Maintain Lawful Policies and Undermines Any Employer's Exercise of Its Legitimate Business Judgment (Exceptions Nos. 19 and 20)**

The established role of the Board is not to make employer policies that it would subjectively prefer. Rather, it is well settled that "management is for management." Neither the Board nor the Court can second guess it or give it gentle guidance by over-the-shoulder supervision." *See* NLRB v. Columbus Marble Works, 233 F.2d 406, 413 (5th Cir. 1956). The role of the Board is also to not substitute its business judgment for that of the employer in the absence of unlawful conduct. *See also* Liberty Homes, Inc., 257 NLRB 1411, 1412 (1981)(explaining that the Board should not substitute its judgment for that of the employer).

However, here, by ordering that Quad "rescind the discriminatory rule…prohibiting employees from wearing baseball caps except those with the Company logo" the ALJ has improperly usurped the ability of Quad to maintain lawful policies as its business requires. His order is erroneous.

Based on the ALJ's remedial order, Quad must either (1) allow employees to wear any hat they would like with any insignia that they would like; or (2) prohibit hats altogether; or (3) establish "special circumstances" at each and every facility around the country in order to support its hat policy. This order, if upheld, improperly usurps Quad's legitimate exercise of its lawful business judgment.

Application of the ALJ's erroneous order also leads to nonsensical results. For example, according to the ALJ's analysis, if an employer maintains a hat policy where the only component included a hat with a Company logo, then the *only* way any company may have such a policy is if the employer shows "special circumstances" – regardless of the fact that the employees may be able to wear union pins, t-shirts or other adornments on other areas of their person. Or, if an employer's policy required employees to wear a white hat with no logo whatsoever, that too would be improper unless the employer established "special circumstances." Or, if an employer's uniform policy required only that employees

wear shirts with Company logos but the safety policy allowed employees to wear hats with union stickers, that would also be improper absent the employer establishing special circumstances for the shirts. While the ALJ's ruling in this case would establish new limitations on any employer's unquestioned right to maintain a uniform policy, it impermissibly undermines long-standing Board policy which allows employers to make policies as their businesses require so long as the policies are lawful. For this additional reason, the ALJ's order should be reversed.

### B. The ALJ Erroneously Concluded That Bingham's Statement Violated Section 8(A)(1) of the Act (Exceptions Nos. 1-13)

While Quad disagrees with the ALJ's finding that Vollene was more credible than Bingham, the ALJ's conclusion was erroneous notwithstanding the ALJ's credibility determination. Even assuming, for purposes of argument, that Bingham made the statement as Vollene claims, the Government still failed to meet its burden of proving that the alleged statement violated Section 8(a)(1) of the Act.

First, the Government failed to introduce any evidence that Vollene's Facebook posts were protected concerted activity. In the absence of such activity, any alleged statements about the posts could not, as a matter of law, have violated the Act. Additionally, the Government failed to carry its burden of proving that the statement was coercive or interfered with Vollene's Section 7 rights under the totality of the circumstances, as it must do in order to succeed on this charge. Therefore, the ALJ erred in finding that the statement violated Section 8(a)(1) of the Act, and the charge must be dismissed.

#### 1. Because There Is No Evidence of Protected Concerted Activity, The ALJ Erred In Concluding That Bingham's Statement Violated The Act (Exceptions Nos. 4, 5, 8, 9, 12, 13)

It is well settled that in order for a statement like the one allegedly made by Bingham to have violated Section 8(a)(1), it must have been in response to some protected

concerted activity on the part of the employee.[14] The Board's test for concerted activity is whether the activity is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself."[15] The question is a factual one and the Board will find concert "[w]hen the record evidence demonstrates group activities, whether 'specifically authorized' in a formal agency sense, or otherwise."[16] Thus, individual activities that are the "logical outgrowth of concerns expressed by the employees collectively" are considered concerted.[17] Concerted activity also includes "circumstances where individual employees seek to initiate or to induce or to prepare for group action" and where individual employees bring "truly group complaints" to management's attention.[18] The burden is on the Government to prove both that the statement was made and that it was unlawful.[19]

Here, the Government presented no evidence that Vollene engaged in protected concerted activity through his Facebook postings. While the Government claims that the postings addressed Vollene's terms and conditions of employment, that claim is entirely unsupported by the evidence in the record because the actual postings were not produced at

---

14 Mueller Brass Co. v. NLRB, 544 F.2d 815, 821 (5th Cir. 1977) ("Certainly, every remark made by a Company supervisor to employees with whom he has day-to-day working contact about union support or sympathies does not violate the Act."); Buel, Inc., NLRB Case No. 11-CA-22936, Office of the General Counsel Advice Memorandum (July 28, 2011) at *2 ("We conclude that the Charging Party did not engage in any concerted activity when he made his Facebook posting. Accordingly, the Employer's actions in response to that posting did not violate Section 8(a)(1)"); Frito-Lay, Inc., NLRB Case No. 36-CA-10882, Office of the General Counsel Advice Memorandum (September 19, 2011) at *2 ("We conclude that the Employer did not violate Section 8(a)(1) because the Charging Party did not engage in any concerted activity.").

15 Meyers Industries, 281 NLRB 882, 885 (1986) (Meyers II), aff'd sub nom, Prill v NLRB, 835 F.2d 1481 (D.C. Cir. 1987), *cert. denied*, 487 U.S. 1205 (1988).

16 Id. at 886.

17 *See, e.g.*, Five Star Transportation, Inc., 349 NLRB 42, 43-44, 59 (2007), *enforced*, 552 F.3d 46 (1st Cir. 2008) (drivers' letters to school committee raising individual concerns over a change in bus contractors were logical outgrowth of concerns expressed at a group meeting).

18 Meyers II, 281 NLRB at 887.

19 NLRB v. Wright Line, Inc., 662 F.2d 899 (1st Cir. 1981).

the hearing.[20] Without being able to review the content of the postings, the only evidence presented that the statements were made was that of Vollene. His testimony is objectionable and should have been excluded under the Best Evidence Rule. *See* United States ex. rel. El-Amin v. George Wash. Univ., F.Supp. 2d 135, 144-45 (D.C. Cir. 2007) (The best evidence rule provides that to prove the content of the writing, recording or photograph, the original document should be produced).

But the ALJ's decision simply ignores this fatal evidentiary flaw in the Government's evidence, another reason why the ALJ's decision must be reversed. *See* NLRB's Division of Judges Bench Book, Trial Manual, August 2010 ("Any [unfair labor practice] proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States"); *see also* Section 102.39 of the NLRB's Rules and Regulations and Section 101.10(a) of NLRB's Statements of Procedure.

Even if the ALJ correctly disregarded the Federal Rules of Evidence, there is still no basis whatsoever to conclude that Vollene engaged in protected or concerted activity. The entire evidence the Government relied upon was Vollene's testimony claiming he made unspecified comments about the Union and "discussed" the Company on Facebook. (Rec: 53:18-20). The fact that Vollene vaguely testified that the postings related to the Company and/or the Union, in and of itself, does *not* make the postings protected. For example, if Vollene posted threats directed at the Company or the employees, those posts would not be protected under the NLRB and the Company could lawfully have taken

---

[20] The ALJ also failed to draw an adverse inference against the Government for failing to present the actual Facebook posts. *See* Advocate So. Suburban Hosp. v. NLRB, 468 F.3d 1038, 1048 fn. 8 (7th Cir. 2006)(The Administrative Law Judge may draw an adverse inference from the Government's failure to present the actual Facebook posts); Parksite Group, 354 NLRB No. 90, slip op. 5 (2009). While the Government certainly could have produced Vollene's actual Facebook posts, it did not. The ALJ completely ignored this evidentiary flaw in concluding the Government met its burden.

adverse action against him had it wished to do so.[21] Even if the statements were "critical" of the Company as testified to by Bingham, that testimony is simply too vague and insufficient to determine that Vollene engaged in protected or concerted activity. In Karl Knauz Motors, Inc., 358 NLRB No. 164 (2012), the Board found that an employee's Facebook posting that made light of an accident that had occurred at the car dealership where he worked was not protected activity and upheld the employer's decision to discharge the employee. The ALJ, whose opinion was affirmed by the Board, considered the fact that the posting was made solely by the employee, without any discussion about it with other employees, and "had no connection to any of the employees' terms and conditions of employment," in finding that the posting was "so obviously unprotected."[22] Similarly another employer did not violate Section 8(a)(1) by demoting an employee for criticizing his employer by posting his complaints about the company on Facebook when there was no concert between employees,[23] and another employer's discharge of an employee was lawful where the employee's Facebook complaints about how he was treated at work were not intended to "initiate or induce coworkers to engage in group action."[24]

Here, without any evidence about the content of Vollene's Facebook postings other than Bingham's hearsay testimony that he saw postings "critical" of the Company, the ALJ could not, as a matter of law, have concluded that the postings were either protected or concerted. As is made clear by case law such as Karl Knauz Motors and others, the *content* of such postings is an essential element of this determination. In the absence of

---

21 Corriveau & Routhier Cement Block v. NLRB, 410 F.2d 347, 351 (1st Cir. 1969) ("Threats of violence are not only not protected activity, they are the very antithesis of protected activity.").

22 Id. at 11.

23 Buel, Inc., NLRB Case No. 11-CA-22936, Office of the General Counsel Advice Memorandum (July 28, 2011) at *2.

24 Frito-Lay, Inc., NLRB Case No. 36-CA-10882, Office of the General Counsel Advice Memorandum (September 19, 2011) at *2; *see also* Meyers II, 281 NLRB at 887 (NLRB found that bartender's Facebook comments about the unfairness of his employer's policies was not concerted activity, despite the fact that it was about employment conditions, because the statement was not an "attempt to initiate group action" about the issues).

protected, concerted activity, any alleged statement made to Vollene about his Facebook posts could not, and did not, violate Section 8(a)(1). In his decision, the ALJ did not address whether the Government established this element of its prima facie case and did not make the necessary factual determination of whether Vollene engaged in protected concerted activity. His failure to engage in this necessary analysis is reversible error.

### 2. The ALJ Failed To Properly Consider the Totality of the Circumstances In Concluding That Bingham's Alleged Statement Violated the Act (Exceptions Nos. 1-13)

The ALJ also erroneously failed to consider the totality of the circumstances, as required, in finding that the alleged statement violated the NLRB. Absent threats of reprisal, promises of benefits, or other coercive statements not based in fact, statements made to employees do not violate the Act.[25] "The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive . . . . In making this determination, the Board considers the **total context** in which the challenged conduct occurs."[26]

In order to find that Bingham's statement "Don't you think that they know what you posted on Facebook" violates the Act, the Board must find that "a threat (to the employee), either latent or overt, [was] contained in the employer's words." This is an objective standard based on the totality of the circumstances. "The inquiry under §8(a)(1) is an objective one which examines--not whether the employer intended, or the employee perceived, any coercive effect--but whether 'the employer's actions would tend to coerce a reasonable employee." *See* Wyman-Gordon Company, Petitioner v. NLRB, 654 F.2d 134, 145 (1st Cir. 1981). Had the ALJ correctly considered the totality of the circumstances surrounding this statement, the ALJ could not have possibly reached the conclusion that Bingham's statement was coercive to Vollene and thus violated the Act.

---

25 *See* Smithfield Packing Co., 344 NLRB No. 1, slip op. at 2 (2004).

26 NLRB v. St. Francis Healthcare Centre, 212 F.3d 945, 954 (6th Cir. 2000) (emphasis added), *quoting* United Parcel Serv. v. NLRB, 41 F.3d 1068 (6th Cir. 1994); *see also* Sunnyvale Med. Clinic, 277 NLRB 1217, 1217 (1985) (to determine whether an 8(a)(1) violation has occurred, the Board must engage in "a case-by-case analysis which takes into account the circumstances [of the situation]").

In Wheeling-Pittsburgh Steel Corp., 618 F.2d 1009, 1020 (3d Cir. 1980), *cert. denied*, 449 U.S. 1078 (1981) a supervisor told an employee that the employee would not have received a lengthy suspension if the employee had "kept his mouth shut" at a disciplinary hearing. The Third Circuit found that the statement was not coercive because of the surrounding circumstances: (1) the supervisor did not initiate the conversation, but instead was only responding to the employee; (2) the exchange was a short one; (3) the supervisor did not speak with "a hostile or vindictive tone"; (4) there was no evidence that the employer had any anti-union animus; and (5) it was "a single, isolated, non-hostile, comment in response to . . . [the employee]." Id. *Every one* of those factors is present in this case: Bingham did not initiate the conversation with Vollene, but was only responding to him; the alleged conversation was brief; Vollene never claimed Bingham's tone was hostile or vindictive; there is no evidence that Quad bears any animus toward the Union; and the comment was "single, isolated, [and] non-hostile." In this case, like in Wheeling-Pittsburgh Steel Corp., there was no violation of Section 8(a)(1).

Moreover, additional circumstances in this case which were not factored into the ALJ's decision reinforce the fact that the alleged statement was in no way coercive to the only listener, Vollene. First, Vollene was widely known to be an active supporter of the Union and was on the bargaining committee in 2007. Had Bingham wanted to "retaliate" or "coerce" Vollene at any time because of his known Union involvement, he certainly had several years to do so. However, there is no evidence that Vollene ever suffered unlawful retaliation or coercion during his long tenure. In fact, Vollene experienced no adverse employment action, loss of wages or benefits as a result of his reassignment in February 2011. (Rec: 81:1-8.) Second, Vollene claims Bingham's statement was made in February, 2011. That is *seven* months after Vollene allegedly made comments on Facebook.[27] Certainly, if the Company or Bingham had any retaliatory motive to punish him for

[27] As the Government failed to produce the postings, there is no evidence that the postings were even made prior to Vollene's reassignment. Assuming for purposes of argument, however, that they were made when alleged, the timeline still suggests an absence of coercion in Bingham's alleged statement.

making comments on Facebook, it certainly would have acted earlier. Third, the Government presented no evidence that the person responsible for the ultimate decision to transfer Vollene and four other employees (Koch) knew about Vollene's alleged postings and no evidence that Bingham discussed or reported Vollene's alleged Facebook posts with Koch or any other Supervisor. Indeed, Bingham was the only Supervisor who was Facebook "friends" with Vollene, so he was the only Supervisor who could view the alleged Facebook comments. (Rec: 51:4-8.) In addition, the ALJ acknowledged that the alleged Facebook postings did not impact the reassignment consideration during the Press Room Supervisor meeting. (ORD: 5:27-30; Rec: 150:25-151:14, 157:6-11, 176:7-18.) Koch further credibly testified regarding the reasons for the reassignment and that they had nothing to do with the Facebook posts. (Rec: 156:12-25, 157:1-11, 160:21-25, 170:22-171:4.) It is unreasonable to conclude that Vollene would have even believed Bingham's statement had an iota of truth given these reassignments—one of whom included the decertification petitioner.

Finally, Vollene and Bingham also both testified that even after the alleged statement they remain friends both on Facebook and otherwise, significant factors which weigh against a finding of coercion.[28]

However, the ALJ ignored these key "circumstances" and concluded that Vollene reasonably believed from Bingham's statements that he was reassigned in "in retaliation" for his "protected activity", i.e., Facebook posts. To reach this result, the ALJ improperly assumed, without any record evidence of the posts that Vollene's Facebook constituted protected concerted activity. Further, while stating he considered the "totality of circumstances", the ALJ's decision relied exclusively on his factual conclusions that

[28] *See, e.g.*, NLRB v. Rockwell M'fing Co., 271 F.2d 109, 118 (3d Cir. 1959) ("friendliness of [supervisor and employee's] relationship" suggested no coercion); NLRB v. K&K Gourmet Meats, Inc., 640 F.2d 460, 465 (3d Cir. 1981) (considering fact that "[employee's] question was put to a self-described 'good friend' with whom she not only regularly rode to work but also engaged in social and recreational activity" in finding no coercion); Dow Chemical Co. v. NLRB, 660 F.2d 637, 649 (5th Cir. 1981) ("the circumstances in which [supervisor's] comments were made cannot be disregarded. Those circumstances cast a light quote different from that in which the board viewed those comments. [Employee] admitted that he had known [supervisor] for twenty-five years and considered him a friend.").

(1) Bingham made the statement; and (2) Bingham did not tell Vollene that Quad did not prevent Vollene from expressing himself off the clock after Vollene expressed concern with Bingham's alleged statement.[29] This evidence is simply insufficient in light of all of the other surrounding circumstances which the ALJ just incorrectly ignored. Had the ALJ properly considered the totality of circumstances, it is clear that Bingham's comment, if ever made, was not coercive to Vollene. At best, it was a "single, isolated, non-hostile comment" made from one friend to another with no evidence of Union animus whatsoever. As the Fifth Circuit stated, "in analyzing a question to detect the presence of coercion, the context, manner, and circumstances in which the question occurred simply cannot be ignored."[30] The ALJ erred by ignoring them, and his decision must therefore be overruled.

## IV. CONCLUSION

For the foregoing reasons, Quad respectfully requests that the Board reverse those portions of the ALJ's Decision and Order to which it has filed Exceptions.

Dated: August 28, 2013

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By [signature]

RONALD J. HOLLAND
ELLEN M. BRONCHETTI

Attorneys for QUAD/GRAPHICS, INC.

---

[29] Bingham testified that he did not remember making the alleged statement at all. Therefore, either the conversation did not happen at all or Bingham did not remember responding to Vollene.

[30] Dow Chemical Co., 660 F.2d at 649.

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 32**

| | |
|---|---|
| **WORLD COLOR (USA) CORP., a wholly-owned subsidiary of QUAD GRAPHICS, INC.** <br> **and** <br> **GRAPHIC COMMUNICATIONS CONFERENCE OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 715-C** | **Case(s)** **32-CA-062242** **32-CA-063140** <br> **Date:** **July 15, 2013** |

**AFFIDAVIT OF SERVICE OF RESPONDENT QUAD/GRAPHIC INC.'S BRIEF IN SUPPORT OF ITS EXCEPTIONS TO DECISION AND ORDER OF THE ADMINISTRATIVE LAW JUDGE**

I, the undersigned employee of Sheppard Mullin Richter & Hampton LLP say that on the date indicated above I served the above-entitled document(s) upon the persons at the addresses and in the manner indicated below. Persons listed below under "E-Service" have voluntarily consented to receive service electronically, and such service has been effected on the same date indicated above.

Yaromil Ralph
Counsel for the Acting General Counsel
National Labor Relations Board
Region 32
1301 Clay Street, Suite 300N
Oakland, California 94512-5211
**VIA E-MAIL:**
yaromil.ralph@nlrb.gov

Anton G. Hajjar, Attorney At Law
O' Donnell, Schwartz & Anderson, PC
1300 L Street NW, Ste 1200
Washington, DC 20005-4184
**VIA E-MAIL:**
ahajjar@odsalaw.com

National Labor Relations Board
Division Of Judges
901 Market St., Suite 300
San Francisco, CA 94103
**E-FILE**

Executive Secretary
National Labor Relations Board
**E-FILE**

August 28, 2013
Date

Karen Davis, Asst. to Ellen Bronchetti, Esq.
Name

Karen Davis
Signature

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| WORLD COLOR (USA) CORP., A WHOLLY OWNED SUBSIDIARY OF QUAD GRAPHICS, INC. | ) | |
| Petitioner/Cross-Respondent | ) | Nos. 14-1028, 14-1037 |
| v. | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| Respondent/Cross-Petitioner | ) | Board Case No. 32-CA-62242 |

---

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify the foregoing document was served on all those parties or their counsel of record through the CM/ECF system if they a registered user or, if they are not by serving a true and correct copy at the address listed below:

Ellen Marie Bronchetti, Esquire, Attorney
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center
Seventeenth Floor
San Francisco, CA 94111-4106

Ronald John Holland, II, Esquire, Attorney
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center
Seventeenth Floor
San Francisco, CA 94111-4106


/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
This 11th day of July 2014